IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

JOSEPH WILLIAMS,       )
                        )
     Petitioner,     )
                        )
v.                        )      CASE NO. CV412-106
                        )
WARDEN ERIC SELLERS,    )
                        )
     Respondent.     )
                        )

## O R D E R

Before the Court is Petitioner Joseph Williams's Petition for Writ of Habeas Corpus under 28 U.S.C. § 2254. (Doc. 1.) After careful consideration of the parties' briefings (Docs. 87, 90, 94), Petitioner's petition (Doc. 1) is **DENIED**. The Clerk is **DIRECTED** to close this case.

### BACKGROUND[1]

I.    UNDERLYING CRIME

The facts of Petitioner's underlying criminal case were set forth by the Supreme Court of Georgia:

> [O]n July 24, 2001, Williams was a jail inmate at the Chatham County Detention Center. See O.C.G.A. § 17-10-30(b)(9) ("murder was committed by a person in, or who has escaped from, the lawful custody of a peace officer or place of lawful confinement"). Seven other inmates, including Michael Deal, were being held in the same unit

---

[1] The factual findings of both the state habeas court and Supreme Court of Georgia are presumed to be correct unless they are rebutted by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); Rolling v. Crosby, 438 F.3d 1296, 1301 (11th Cir. 2006) (per curiam).

as Williams. Williams and four of the other inmates, Leon McKinney, Pierre Byrd, Michael Wilson, and John McMillan, discovered a loose window and used an improvised chisel to chip away at the wall around it. Deal inquired what the men were doing but left when he was told "to mind his own business." Williams and other inmates began to suspect that Deal had informed, or was going to inform, the jail authorities about the escape plan. McKinney suggested stabbing Deal with the improvised chisel, but Williams objected that there would be too much blood and that their plan would be frustrated. The group then carried out an alternative plan to strangle Deal and make the killing appear to be a suicide. McKinney engaged Deal in a discussion about their relative body sizes and then, facing Deal, lifted him in a "bear hug." Williams then began strangling Deal from behind with an Ace bandage. Deal fell to the floor but did not immediately lose consciousness. The evidence is unclear whether it was Wilson or Byrd, but one of those two men then assisted Williams by taking one end of the Ace bandage and completing the strangulation in a "tug-of-war." Byrd invited Anthony King, an inmate who had been friendly with Deal, into Byrd's cell to distract King as Deal's body was moved. Williams then dragged Deal's body to Deal's cell, flushed the Ace bandage down the toilet, cleaned up blood and hair on the floor with a rag, flushed the rag, tied a bed sheet around Deal's neck, and finally, with the assistance of McKinney and McMillan, lifted Deal's body and tied the bed sheet to a grate in the ceiling to make the death appear to be a suicide. After the murder, Williams and Byrd favored also killing King and Dewey Anderson, but McKinney and McMillan objected. Byrd, later troubled by dreams about the victim, contacted his attorney, passed a note about the murder to a jail guard, and then directed authorities to the improvised chisel, the loosened window, and a letter about the murder written to him by Williams. Williams confessed in an audiotaped interview conducted by a GBI agent.

Williams v. State, 281 Ga. 87, 88–89, 635 S.E.2d 146, 147–49 (2006).

## II.  PLEA AND SENTENCING PHASE OF TRIAL

Petitioner was arrested on August 3, 2001 for the murder of Michael Deal. (Doc. 9, Attach. 1 at 39-41.) On October 31, 2001, Petitioner was indicted in Chatham County, Georgia, for murder and felony murder.[2] (Id. at 43-44.) Michael Edwards and Tammy Cox Stokes[3] were appointed to represent Petitioner. (Doc. 10, Attach. 3 at 7.)

Petitioner's trial began on March 26, 2004. (Doc. 10, Attach. 17 at 1.) On April 1, 2004, prior to striking a jury, Petitioner stated that he wanted to plead guilty to the charge of murder. (Doc. 11, Attach. 2 at 68-69.) During an ex parte hearing, Petitioner also expressed that he did not want his counsel to present mitigation evidence during the sentencing phase of trial. (Doc. 11, Attach. 3 at 14.) The following exchange occurred between Petitioner and the trial court:

> **Court:** You don't want [trial counsel] to put on any of the evidence that they've developed to show the jury why the jury should return a verdict of less than death?
>
> **Petitioner:** I don't—I don't want that.
>
> **Court:** Okay. Can you tell me why you don't want that?
>
> **Petitioner:** Well, I don't—I don't feel too enthusiastic about them knowing about my past, my childhood and things like that. I'd rather keep it to myself. It's personal.

---

[2] Leon McKinney was also indicted as a co-defendant. (Doc. 9, Attach. 1 at 43-44.)

[3] At the time of Petitioner's trial, Ms. Stokes's surname was Cox. For purposes of this order, the Court will refer to her as Ms. Stokes.

**Court:** But you do realize that that increases the chance that the jury could return a verdict of death?

**Petitioner:** Yes, ma'am.

(Id.)

On Friday, April 2, 2004, the trial court selected a jury. (Doc. 11, Attach. 4 at 14.)    Before the trial court accepted Petitioner's plea or his decision to refuse mitigation evidence, however, it ordered that Petitioner undergo a competency evaluation.[4] (Doc. 11, Attach. 2 at 69; Doc. 11, Attach. 3 at 14.) Over the weekend, mental health professionals evaluated Petitioner, and, on Monday, April 5, 2004, the trial court conducted a competency hearing outside of the jury's presence. (Doc. 11, Attach. 4 at 37-38.)

At the competency hearing, Dr. Nic D'Alesandro and Dr. Phillip Barron testified about their competency evaluations of Petitioner. (Id. at 38-39.) Dr. D'Alesandro, the director of forensic services at Georgia Regional Hospital, opined that Petitioner was competent and was not suffering from any mental illness or intellectual disability.  (Id.  at  35.)  Dr.  D'Alesandro  also  opined  that

---

[4] Prior to trial, trial counsel hired Dr. James Maish, a forensic psychologist, to conduct a psychological evaluation of Petitioner. (Doc. 14, Attach. 3 at 21; Doc. 19, Attach. 23 at 1, 47, 51, 61, 68, 70.) However, because Dr. Maish's tests revealed no signs of intellectual or neurological impairment, trial counsel decided not to present him as a witness at trial. (Doc. 17, Attach. 11 at 89-90.)

Petitioner was competent to enter a plea of guilty and proceed to the sentencing phase of trial. (Id.) Next, Dr. Barron, a psychologist with the Georgia Regional Hospital, testified that he concurred with Dr. D'Alesandro's conclusions and that, based on Dr. Barron's evaluation, Petitioner was competent. (Id. at 36.)

After Dr. D'Alesandro and Dr. Barron opined that Petitioner was competent to enter a plea, the trial court held an ex parte competency hearing with Petitioner and his trial counsel concerning Petitioner's decision to forgo the presentation of mitigation evidence. (Id. at 37.) On that issue, Dr. D'Alesandro testified that Petitioner was competent to decide whether to allow his trial counsel to present mitigation evidence. (Id. at 38-39.) Once again, Dr. Barron concurred with Dr. D'Alesandro's opinion and testified that Petitioner was "making a rational and well-considered decision" and that Petitioner "explicitly denied on several occasions any suicidal ideation." (Id. at 41-42.)

After the competency hearing, Petitioner pleaded guilty to the charge of malice murder and the trial proceeded to the sentencing phase.[5] (Id. at 55, 63.) The Supreme Court of Georgia, in its opinion denying Petitioner's direct appeal, succinctly summarized the evidence that the State presented in aggravation during the sentencing phase of trial:

_____

[5] The State nolle prossed the felony murder charge. (Doc. 9, Attach. 1 at 42.)

In support of the O.C.G.A. § 17-10-30(b)(1) aggravating circumstance, the State presented three certified convictions of Williams, one for the armed robbery of Harry Jaymes, one for the murder of Iris Hall, and one for the murder of Taureen Graham. The State also presented testimony regarding those three crimes. Harry Jaymes testified that Williams delivered some stereo equipment, that he gave Williams a cash gratuity from a bag of money, and that Williams returned with an accomplice two days later on May 27, 1999, hit Jaymes in the head repeatedly with a handgun, and threatened to kill Jaymes if he did not reveal where the bag of money was. Jaymes escaped, threw a brick through his car's window to set off the alarm, and had a neighbor call police. A GBI agent testified that Williams confessed during an audiotaped statement, which was played for the jury, to the murders of Taureen Graham and Iris Hall. Williams explained in the statement that he had been hired to murder Taureen Graham's older brother but that, on July 31, 1999, he murdered the wrong person. Janet Cooper testified that, during a drug deal on July 11, 1999, Williams held Cooper and Iris Hall at gunpoint, placed Cooper in a bathroom, and searched Hall's house. As Cooper escaped from the bathroom window, she heard the shots that killed Hall. At Williams's trial for Hall's murder, Williams "made slashing gestures and gunshot gestures" toward Cooper. Williams later, in March 2004, gave a letter to Cooper in which he stated, "I've killed many men before that incident, even killed a couple afterwards." The letter continued as follows:

> August will be an even five years of incarceration for me. In those five years, I've killed two men, slit an officer's throat with a razor, stabbed two inmates, and whipped my first lawyer's ass. I am who I am, Janet. Those walls can't stop me.

The evidence also showed that Williams had committed several other criminal acts. A criminal defense attorney testified that Williams struck him repeatedly during a jailhouse interview on September 28, 2001. A prison guard testified that Williams slashed his face and throat with a razor blade embedded in a newspaper on December 17, 2001. Testimony from two prison officers to whom Williams confessed and testimony from the surviving victim showed that Williams murdered one prison inmate

and repeatedly stabbed another with an improvised weapon
on January 26, 2003. In his audiotaped confession about
the 2003 prison attack, Williams stated that he had also
planned to kill a third inmate that day but the man's
cell door had been locked.

Williams, 281 Ga. at 88-89, 635 S.E.2d at 147-49.

During the State's presentation of its case in aggravation,
the trial court held an ex parte hearing to allow Petitioner's
trial counsel to offer proof of mitigation evidence that they would
present if Petitioner permitted them to do so. (Doc. 11, Attach.
7 at 52.) The trial court emphasized that trial counsel should
discuss on the record what they had done to prepare a case in
mitigation in the event that Petitioner changed his mind about
mitigation evidence, especially considering that "this record will
be scrutinized at some point for effectiveness . . . ." (Id. at
52-54.) Mr. Edwards proffered the mitigation evidence that trial
counsel intended to offer to the jury if permitted. Mr. Edwards
explained that trial counsel hired Jeff Yungman, a forensic social
worker, to assist them in gathering and analyzing mitigation
evidence and Mr. Edwards described the investigation that Mr.
Yungman conducted. (Id. at 58-65.) Mr. Edwards also described
Petitioner's unstable childhood, including his truancy from
school, his frequent change of residences, his mother's mental
health disorder, and his abusive father and stepmother. (Id. at
65-83.) Mr. Edwards told the trial court that trial counsel also
intended to present Donna Parker as a witness "to offer insight

7

and – and ideas about who [Petitioner] . . . is" and that she and Petitioner had been corresponding via letter for approximately a year. (Id. at 84-85.) Petitioner did not object to this proffer of evidence.

Once the State concluded its case in aggravation, trial counsel requested another ex parte hearing to discuss Petitioner's refusal to allow them to present mitigation evidence. (Doc. 11, Attach. 9 at 26.) During the hearing, despite his trial counsels' advice to the contrary, Petitioner affirmed that he was directing his trial counsel not to present mitigation evidence. (Id. at 27-28.) The Court then called a recess. (Id. at 33-34.) Later that night, however, Mr. Edwards and Petitioner's family met with Petitioner and Petitioner finally agreed to permit his trial counsel to present mitigation evidence. (Doc. 11, Attach. 10 at 4; Doc. 12, Attach. 6 at 90-91.)

The next day, April 7, 2004, Petitioner presented his mitigation evidence. (Doc. 11, Attach. 10 at 1.) For his part, Petitioner presented the testimony of two mitigation witnesses: Donna Parker and Jeff Yungman. (Id. at 5, 21.) The first witness, Ms. Parker, testified that, although she met Petitioner for the first time at trial, she had been corresponding with him via letters since October 2003. (Id. at 11, 18.) Ms. Parker testified that she considered Petitioner one of her best friends and confidantes and that she revealed intimate details about her life

8

to Petitioner in her letters. (<u>Id.</u> at 13.) Ms. Parker read an excerpt from one of Petitioner's letters, wherein Petitioner encouraged Ms. Parker, commended her for raising five boys, and expressed regret for "disregard[ing] [his] principles." (<u>Id.</u> at 14-16.)

Next, Mr. Yungman, a forensic social worker, testified about Petitioner's background and its effect on Petitioner's risk of future criminality. (<u>Id.</u> at 21.) Mr. Yungman testified that he interviewed Petitioner for a total of approximately eight hours and interviewed several of Petitioner's siblings, including Sherry Williams, Patsy Johnson, Tina Williams, Tanise Williams, Rebecca McRae, and Sheldon Williams. (<u>Id.</u> at 44.) Mr. Yungman also reviewed Petitioner's school records, records from Petitioner's hospitalization, records from the Georgia Department of Corrections, and Petitioner's mother's hospitalization records. (<u>Id.</u>) In analyzing Petitioner's risk of criminality, Mr. Yungman utilized a 28-factor assessment articulated by the Office of Juvenile Justice. (<u>Id.</u> at 45.)

Mr. Yungman testified that Petitioner's mother suffered from schizo-effective disorder and that she was hospitalized for three years because of her condition. (<u>Id.</u> at 50-51, 54-55.) On the topic of Petitioner's mental health, Mr. Yungman testified that, as a child, Petitioner suffered from an internalizing disorder, which appeared in the form of bedwetting and hyperactivity. (<u>Id.</u> at 55-

56.) Mr. Yungman also noted that hyperactivity has a strong correlation to future criminal activity. (Id. at 56.)

Mr. Yungman then discussed Petitioner's school records and highlighted that Petitioner was absent from school for a significant number of days each year. (Id. at 60, 62.) Petitioner ultimately dropped out of school in the seventh grade. (Id. at 60, 62.) Mr. Yungman stated that truancy and dropping out of school has a high correlation to future criminal activity. (Id. at 60.)

On the topic of Petitioner's childhood, Mr. Yungman testified that he interviewed Petitioner and several of his family members about their childhood and home life. (Id. at 31-32.) Mr. Yungman further testified that Petitioner's stepmother and father subjected Petitioner to severe abuse. (Id. at 65-66.) Petitioner's sisters informed Mr. Yungman that Petitioner was " 'targeted and tormented by his stepmother.' " (Id. at 65.) Mr. Yungman testified that when Petitioner was a child, Petitioner's stepmother frequently beat and whipped him with various objects, including an extension cord. (Id. at 66.) Petitioner's stepmother also held Petitioner's head under water, made Petitioner sleep under the house during inclement weather, and, after Petitioner wet the bed, she forced Petitioner to sleep in a small closet on top of his soiled clothes. (Id.) Mr. Yungman testified that at one point Petitioner's stepmother "somehow hung him up from a door with a rope around his neck with his feet on the doorknob so that if he

10

would move off the doorknob, then he would choke himself." (Id. at 67.)

Mr. Yungman also testified that Petitioner's stepmother hung Petitioner from a clothesline between two pecan trees in his wet clothes and that, in preparation for his testimony, Mr. Yungman visited Petitioner's childhood home and confirmed the existence of the pecan trees and clothesline. (Id. at 67.) Additionally, Mr. Yungman testified that Petitioner's stepmother hit him in the head with a ball peen hammer and, on another occasion, she stuck a plunger down Petitioner's throat as punishment for failing to separate the laundry. (Id. at 67.)

Mr. Yungman also testified that Petitioner's father severely and frequently abused him. (Id.) Petitioner's father beat and whipped Petitioner with switches, a water hose, a piece of a tire, and a belt that left "white welt marks on [Petitioner's] body . . . ." (Id.) At times, Petitioner's father would tie Petitioner to a tree in the backyard and beat him, and then leave Petitioner tied to the tree. (Id. at 67-68.)

Mr. Yungman noted that Petitioner's hospitalization records from 1987 indicated that Petitioner had scars all over his body, which Mr. Yungman believed resulted from the frequent abuse that Petitioner suffered as a child. (Id. at 68-69.) Mr. Yungman stated that, based on the consistent abuse, Petitioner "was taught to deal with conflict through violence." (Id. at 79.) In the end, Mr.

11

Yungman opined that 24 of 28 the risk factors identified by the Office of Juvenile Justice were present in Petitioner's background and that the presence of so many factors made it "quite likely that [Petitioner] would engage in future criminal conduct . . . ." (Id. at 88.) Mr. Yungman explained that although the risk factors present in Petitioner's background did not excuse his behavior, the high number of risk factors present in Petitioner's background helped explain why Petitioner may behave violently, stating that "[n]obody gets up one day and commits a crime without something going on in their life previously." (Doc. 11, Attach. 11 at 1.)

After Petitioner presented mitigation evidence, counsel for both sides made their closing arguments. (Id. at 29-69.) On the same day, the jury returned a sentence of death. (Doc. 9, Attach. 32 at 70.) The jury found that two statutory aggravating circumstances existed in Petitioner's case. (Id. at 69.) First, the jury found beyond a reasonable doubt that the murder of Michael Deal was committed while Petitioner was in a place of lawful confinement. (Id.) Second, the jury found beyond a reasonable doubt that the murder of Michael Deal was committed by a person with a prior record of conviction for murder and armed robbery. (Id.)

After a hearing, the trial court denied Petitioner's motion for a new trial. (Doc. 9, Attach. 35 at 79.) The Georgia Supreme Court affirmed Petitioner's sentence on September 18, 2006. Williams, 281 Ga. at 88, 635 S.E.2d at 147. The United States

12

Supreme Court denied Petitioner's petition for writ of certiorari on April 21, 2008. <u>Williams v. Georgia</u>, 553 U.S. 1004, 1004, 128 S. Ct. 2046, 2046, 170 L. Ed. 2d 793 (2008).

III. <u>STATE HABEAS PETITION</u>

On March 17, 2009, Petitioner filed a state habeas corpus petition in the Superior Court of Butts County, Georgia, arguing, among other things, that his trial counsel were ineffective during the sentencing phase of trial. (Doc. 11, Attach. 30 at 8.) On March 1, 2010, Petitioner filed an amended petition, also arguing, among other things, that his trial counsel were ineffective during the sentencing phase of trial. (Doc. 12, Attach. 2 at 3-10.) On July 12, 2010, the state habeas court conducted a two-day evidentiary hearing on Petitioner's ineffective assistance of counsel claim. (Doc. 12, Attachs. 4-8; Doc. 13, Attachs. 1-3; Doc. 14, Attachs. 1-16; Doc. 15, Attachs. 1-3; Doc. 16, Attachs. 1-18; Doc. 17, Attachs. 1-27; Doc. 18, Attachs. 1-23; Doc. 19, Attachs. 1-32; Doc. 20, Attachs. 1-33; Doc. 21, Attachs. 1-29; Doc. 22, Attachs. 1-16.)

At the evidentiary hearing, Petitioner presented the live testimony of eight witnesses, including Mr. Edwards and Ms. Stokes. (Doc. 12, Attach. 4 at 2-3.) Petitioner also presented numerous affidavits, medical records, institutional records from the Georgia Department of Corrections and trial counsels' files from

13

Petitioner's trial. (Id. at 7-11.) The Court will summarize the witnesses' live testimony and affidavit testimony.

Two of Petitioner's sisters, Tynese Williams and Tina Williams, and his cousin, Deborah Williams, testified that Petitioner's stepmother and father abused him throughout his childhood. (Id. at 36-83.) These witnesses described several instances of abuse that they witnessed, such as Petitioner's stepmother hanging him from a door frame while Petitioner balanced on the doorknob, forcing him to sleep on his soiled clothes in a closet, and hanging him from a clothesline. (Id. at 41-48.) Tynese Williams described the closet Petitioner slept in as very small and noted that Petitioner slept in the closet more often than his bed. (Id. at 43.)

Petitioner's sisters and cousin all testified that they witnessed Petitioner's stepmother and father whip him with various objects such as a water hose, switches, belts, and rubber, and these objects left welts on Petitioner and tore Petitioner's skin. (Id. at 45-81; Doc. 14, Attach. 1 at 29.) At times, Petitioner's father would force Petitioner to remove his clothes before a beating. (Doc. 12, Attach. 4 at 60, 73-81.) Petitioner's father and stepmother also called Petitioner names, including "Black Sheep," "Pissy" and "Black." (Id. at 59.) Petitioner attempted to run away several times. (Id. at 48.)

14

Petitioner's sisters testified that they met with trial counsel several times prior to trial and told trial counsel about Petitioner's childhood. (Id. at 50, 68.) Petitioner's sisters stated that they would have been willing to testify at Petitioner's trial had trial counsel asked them. (Id. at 50, 69.) Petitioner's cousin did not speak with trial counsel prior to trial, but claims she would have had she been asked. (Id. at 83.)

At the habeas hearing, Petitioner also presented affidavit testimony from other witnesses, including his family members, friends, and other inmates that were incarcerated with Petitioner. (Id. at 7.) In summary, the affidavit witnesses all testified that Petitioner endured physical and emotional abuse and neglect throughout his childhood and adolescence. Petitioner's biological mother left Petitioner and his siblings when Petitioner was very young. (Doc. 14, Attach. 1 at 18.) Petitioner's mother suffered from severe mental issues, including hallucinations, and she was eventually committed to Georgia Regional Hospital. (Id. at 41.) Petitioner's father did not believe that Petitioner was his son and called Petitioner "no good" and "faggot." (Id. at 14-15.) Petitioner's father beat Petitioner more often than he beat Petitioner's siblings and Petitioner's father once threatened Petitioner, stating "I'm gonna beat the back off you" and "I'm gonna blow your brains out." (Id. at 15, 20, 47-48.) Petitioner would hide under the house to escape his father's abuse. (Id. at

15

48.) Petitioner's stepmother fought Petitioner's brothers and one of Petitioner's brothers accused her of trying to have sex with him when he was 12 or 13 years old. (Id. at 15.)

The affiants also discussed interactions that they had with Petitioner during his adolescence. Several of these witnesses saw Petitioner bite the top off of a glass bottle, chew the glass, and swallow the glass. (Id. at 64, 69.) Petitioner would sometimes talk fast and do "wild stuff" and, other times, Petitioner would sit by himself and stare, which one friend termed "floating." (Id. at 69.)

While Petitioner was detained in a youth detention center, Petitioner was beaten by an officer. (Id. at 56.) Petitioner told Stanley Freeman, Petitioner's friend, that, while in the youth detention center, Petitioner was raped by two older boys. (Id. at 70.) Mr. Freeman also testified that Petitioner disclosed to him that he was also raped at Arrendale State Prison in Alto, Georgia. (Id. at 70-71.) According to William West, a Youth Development worker at the detention center where Petitioner was housed, Petitioner was cooperative and responded well to authority. (Id. at 86-87.)

Petitioner's aunt, Carla Fay Jones, stated that, during a time when Petitioner lived with her, he called her into his room and when she entered he was holding on to the bed as if something was after him. (Id. at 84.) Petitioner told Ms. Jones that the

16

devil was "riding him" and Petitioner looked terrified. (Id. at 84.)

During the habeas hearing, Petitioner also presented the live testimony of Dr. David Lisak, a forensic psychologist. (Doc. 12, Attach. 6 at 2.) Dr. Lisak interviewed and evaluated Petitioner, but he did not perform any psychological testing on Petitioner. (Id. at 6-7.) Dr. Lisak also reviewed Petitioner's records and the affidavits from other witnesses. (Id. at 7-8.)

Dr. Lisak described the abuse that Petitioner suffered as "torture" and "some of the worst abuse that [he had] encountered as a professional." (Id. at 9.) Dr. Lisak opined that Petitioner had lasting psychological effects from the abuse he suffered. (Id.) Dr. Lisak then described several instances of abuse that Petitioner suffered, including his stepmother (1) tying a tie around his neck and making him stand on a doorknob to prevent hanging himself; (2) holding his head under water; and (3) shoving the wooden handle of a plunger down his throat. (Id. at 20-23.) Dr. Lisak also described how Petitioner's father frequently whipped and beat him with switches and how these beatings left scars on Petitioner's body. (Id. at 23-24.)

Dr. Lisak also testified that Petitioner told him about sexual abuse that Petitioner suffered as a child. (Id. at 22-31.) According to Dr. Lisak, a female neighbor and a man named "Dwight" sexually abused and raped Petitioner. (Id. at 31-33.) Dr. Lisak

opined that it is common for individuals, like Petitioner, who suffer such sexual and physical abuse to engage in violence and that Petitioner may suffer from dissociative disorder as a result of the abuse. (Id. at 41.) Dr. Lisak, however, admitted that he did not diagnose Petitioner with dissociative disorder and that he had no knowledge as to whether Petitioner was dissociating when he murdered Mr. Deal. (Id. at 57.)

The state habeas court ultimately denied Petitioner's petition, as amended, on October 18, 2010. (Doc. 22, Attach. 33.) The state habeas court found that trial counsel conducted a "reasonable and competent investigation of Petitioner's case, despite Petitioner's explicit desire to enter into a guilty plea and repeated and consistent instructions to [trial counsel] that he did not want any mitigation evidence presented in the sentencing phase." (Id. at 10.) The state habeas court also found that trial counsels' failure to present family members or psychological experts as witnesses did not deprive Petitioner of a fair trial because Mr. Yungman presented much of the same evidence that the family members or experts would have presented, the family members were still present in the courtroom, and Mr. Yungman's testimony "was very detailed and covered Petitioner['s] entire life." (Id. at 12.) Ultimately, the state habeas court determined that, based on the evidence presented during the habeas proceedings, Petitioner failed to prove that trial counsels' performance was

18

deficient and, even if it was deficient, that it prejudiced Petitioner's defense. (Id.) Further attempts to appeal were similarly unavailing. See Williams v. Humphrey, 568 U.S. 982, 982, 133 S. Ct. 530, 530, 184 L. Ed. 2d 346 (2012).

IV.  FEDERAL HABEAS PETITION

On April 18, 2012, Petitioner filed a 28 U.S.C. § 2254 petition in this Court. (Doc. 1.) In his petition, Petitioner raised nine general claims for relief. (Id. at 2-3.) After filing his habeas petition, Petitioner filed a Motion for Discovery seeking disclosure of portions of the District Attorney's case file, which Petitioner argued contained information about the prosecution's use of Pierre Byrd as a witness in his case and the benefits that Byrd may have been promised for his assistance. (Doc. 30, Attach. 1 at 1, 13-14.) In his motion for discovery, Petitioner also sought discovery related to Byrd's files in the custody of the Georgia Board of Pardons and Paroles and discovery related to Michael Deal's time as a confidential informant with the Drug Enforcement Agency. (Id. at 16, 19.) On July 26, 2013, this Court granted Petitioner's requested discovery concerning the District Attorney's files, denied discovery as to Byrd's parole files, and directed the parties to provide additional briefing addressing whether Petitioner developed the factual basis for his claims regarding Michael Deal's DEA files in his state habeas proceeding. (Doc. 35 at 15-16.) After further briefing, this Court denied

19

Petitioner's requested discovery related to Michael Deal. (Doc. 42.)

Petitioner subsequently filed a Motion for an Evidentiary Hearing requesting an evidentiary hearing on two issues: (1) the State's suppression of material exculpatory evidence that was revealed after this Court ordered the disclosure of the District Attorney's files; and (2) the ineffectiveness of state habeas counsel in failing to challenge trial counsels' ineffectiveness, pursuant to Martinez v. Ryan, 566 U.S. 1 (2012), and Trevino v. Thaler, 569 U.S. 413 (2013). (Doc. 52 at 11, 18.) The Court appointed Supplemental Counsel Don Samuel to address Petitioner's Martinez/Trevino claim. (Doc. 58 at 1.) Following additional briefing, the Court ultimately denied Petitioner's request for an evidentiary hearing and found that neither Martinez nor Trevino were applicable in Georgia. (Doc. 65 at 16-17, 22.)

On September 14, 2017, Petitioner filed his brief with respect to issues of procedural default, cause and prejudice, and miscarriage of justice. (Doc. 69.) On April 3, 2019, after additional briefing, the Court determined that, for the purposes of his upcoming merits brief, Petitioner would not be permitted to brief any claim raised in Claim II, Claim III, Claim IV, Claim V, Claim VI, Claim VII, Claim VIII, or Claim IX of Petitioner's petition. (Doc. 81 at 47.) The Court further found that Petitioner would not be permitted to brief many of his claims related to Claim

I—his ineffective assistance of counsel claim. (<u>Id.</u>) The Court only permitted Petitioner to brief his claims related to his trial counsel's failure to investigate and present mitigation evidence related to his background and mental health. (<u>Id.</u>) Additionally, Petitioner was permitted to brief his claim that his trial counsel was ineffective for failing to raise this error on direct appeal. (<u>Id.</u>)

On May 20, 2019, Petitioner filed his Brief in Support of Petition for Writ of Habeas Corpus. (Doc. 87.) Respondent filed a response brief on June 29, 2019 (Doc. 90) and Petitioner filed a reply brief on July 15, 2019 (Doc. 94). Petitioner's petition is now ripe for review on the merits.

**ANALYSIS**

I.   <u>STANDARD OF REVIEW</u>

"[T]he writ of habeas corpus has historically been regarded as an extraordinary remedy, 'a bulwark against convictions that violate fundamental fairness.' " <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 633, 113 S. Ct. 1710, 1719, 123 L. Ed. 2d 353 (1993) (quoting <u>Engles v. Isaac</u>, 456 U.S. 107, 126, 102 S. Ct. 1558, 1571, 71 L. Ed. 2d 783 (1982) (internal quotations omitted)). Accordingly, "[t]hose few who are ultimately successful [in obtaining habeas relief] are persons whom society has grievously wronged and for whom belated liberation is little enough compensation." <u>Id.</u> at 634, 113 S. Ct. at 1719 (quoting <u>Fay v. Noia</u>, 372 U.S. 391, 440-

21

41, 83 S. Ct. 822, 850, 9 L. Ed. 2d 837 (1963)) (alteration in original). The notion that habeas relief is an extraordinary remedy is "especially true when federal courts are asked to engage in habeas review of a state court conviction pursuant to 28 U.S.C. § 2254." McWhorther v. Dunn, 4:13-cv-2150, 2019 WL 277385, at *10 (N.D. Ala. Jan. 22, 2019).

A district court's review of a petitioner's claims that were considered on the merits by a state court is governed by the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"). See Payne v. Allen, 539 F.3d 1297, 1312 (11th Cir. 2008). Pursuant to AEDPA,

> [a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). Under this provision, "AEDPA 'imposes a highly deferential standard for evaluating state court rulings' and 'demands that state-court decisions be given the benefit of the doubt.' " Bishop v. Warden, GDCP, 726 F.3d 1243, 1253 (11th Cir. 2013) (quoting Renico v. Lett, 559 U.S. 766, 773, 130 S. Ct. 1855, 1862, 176 L. Ed. 2d 34 (2010)). Accordingly, the Court must not

22

assess whether it "believes the state court's determination was incorrect, but whether the determination was unreasonable—a substantially higher threshold." Schriro v. Landrigan, 550 U.S. 465, 473, 127 S. Ct. 1933, 1939, 167 L. Ed. 2d 836 (2007) (citation omitted); see also Miller-El v. Cockrell, 537 U.S. 322, 341, 123 S. Ct. 1029, 1042, 154 L. Ed. 2d 931 (2003) (discussing that a state court's ruling must be "objectively unreasonable" to warrant granting a writ under § 2254).

A state court decision is "contrary to . . . clearly established Federal law" under § 2254(d)(1) "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 413, 120 S. Ct. 1495, 1523, 146 L. E. 2d 389 (2000). A state court decision involves "an unreasonable application of" clearly established federal law under § 2254(d)(2) "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413, 120 S. Ct. at 1523. Within this review, the "federal habeas court . . . should ask whether the state court's application of clearly established federal law was objectively unreasonable." Id. 529 U.S. at 409, 120 S. Ct. at 1521; see also Virginia v. LeBlanc, --- U.S. ---,

137 S. Ct. 1726, 1728, 198 L. Ed. 2d 186 (2017) ("In order for a state court's decision to be an unreasonable application of this Court's case law, the ruling must be objectively unreasonable, not merely wrong; even clear error will not suffice.") (quotation marks omitted). Generally, federal habeas relief is precluded "so long as 'fair-minded jurists could disagree' on the circumstances of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101, 131 S. Ct. 770, 786, 178 L. Ed. 2d 624 (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S. Ct. 2140, 2149, 158 L. Ed. 2d 938 (2004)). In other words, a habeas petitioner can obtain relief only by establishing that no fair-minded jurist could agree with the state court's decision. Woods v. Etherton, --- U.S. ---, 136 S. Ct. 1149, 1152-53, 194 L. Ed. 2d 333 (2016); Pope v. Sec'y, Fla. Dep't of Corr., 752 F.3d 1254, 1262 (11th Cir. 2014).

When determining whether a state court decision is based on an unreasonable determination of fact, this Court must presume that the state court's factual findings are correct unless rebutted by clear and convincing evidence. Miller-El, 545 U.S. at 240, 125 S. Ct. at 2325. In defining this standard, the Supreme Court of the United States has noted that "[t]he standard is demanding but not insatiable." Id. "The Supreme Court has found state factual findings unreasonable under § 2254(d)(2) when the direction of the evidence, viewed cumulatively, was too powerful to conclude anything but the petitioner's factual claim, and when a state

24

court's finding was clearly erroneous." <u>Landers v. Warden, Atty. Gen. of Ala.</u>, 776 F.3d 1288, 1294 (11th Cir. 2015) (internal citations and quotations omitted).

II.   <u>THE RELEVANT STATE COURT DECISION</u>

As an initial matter, this Court's discussion focuses on the reasonableness of the state habeas court's final order. (Doc. 22, Attach. 33.) Although the state habeas court's decision is not the last state-court adjudication on the merits, the Supreme Court of Georgia issued an unexplained, summary denial of Petitioner's certificate of probable cause to appeal. (Doc. 22, Attach. 38.) Because the Supreme Court of Georgia provided an unexplained opinion, this Court "presume[s] that that the [Supreme Court of Georgia] adopted the same reasoning" as the state habeas court. <u>Wilson v. Sellers</u>, --- U.S. ---, 138 S. Ct. 1188, 1192, 200 L. Ed, 2d 530 (2018). Therefore, this Court will " 'look through the unexplained decision' of the Supreme Court of Georgia to review" to the state habeas court's decision "as if it were the last state-court adjudication on the merits." <u>Raulerson v. Warden</u>, 928 F.3d 987, 996 (11th Cir. 2019) (quoting <u>Wilson</u>, 138 S. Ct. at 1192).

III.  <u>INEFFECTIVE ASSISTANCE OF COUNSEL CLAIMS</u>

In his brief, Petitioner asserts two distinct ineffective assistance of counsel claims. First, Petitioner argues that his trial counsel failed to adequately investigate and present mitigation evidence during the sentencing phase of trial. (Doc. 87

at 60.) Second, Petitioner argues that he received constitutionally inadequate representation on appeal. (Doc. 87 at 210.) The Court will explain the legal standard applicable to ineffective assistance claims and then discuss each of Petitioner's claims in turn.

A. Legal Standard

The Supreme Court of the United States explained the standard for analyzing ineffective assistance claims in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). In Strickland, the Supreme Court created a two-part test for establishing "[a] convicted defendant's claim that counsel's assistance was so defective as to require a reversal of conviction or death sentence." Id. at 687, 104 S. Ct. at 2064. "Unless a defendant makes both showings [of the two-part test], it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." Id.

Under the first prong of the two-part test, "the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. Under the second prong of the two-part test, the defendant must show that his counsel's deficient performance prejudiced the defense. Strickland, 466 U.S. at 687, 104 S. Ct. at

26

2064. To establish prejudice, a petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694, 104 S. Ct. at 2068. "When evaluating this probability, 'a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury.' " Brownlee v. Haley, 306 F.3d 1043, 1060 (11th Cir. 2010) (quoting Strickland, 466 U.S. at 695, 104 S. Ct. at 2069). This requires that "the reviewing court must consider all the evidence—the good and the bad—when evaluating prejudice." Wong v. Belmontes, 558 U.S. 15, 26, 130 S. Ct. 383, 390, 175 L. Ed. 2d 328 (2009).

When instructing courts as to how to apply the two-part test in Strickland, the Supreme Court emphasized the that "judicial scrutiny of counsel's performance must be highly deferential." 466 U.S. at 689, 104 S. Ct. at 2065. The Supreme Court noted that "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful to conclude that a particular act or mission of counsel was unreasonable." Strickland, 466 U.S. at 689, 104 S. Ct. at 2065. Accordingly, courts must "not measure counsel against what we imagine some hypothetical 'best' lawyer would do." LeCroy v. United States, 739 F.3d 1297, 1313 (11th Cir. 2014). Rather, a court must consider whether "in light of all the circumstances,

27

the identified acts or omissions [of the attorney] were outside the wide range of professionally competent assistance." Id. at 690, 104 S. Ct. at 2066. Courts must conduct this analysis with a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689, 104 S. Ct. at 2065. "Strategic decisions will amount to ineffective assistance only if so patently unreasonable that no competent attorney would have chosen them." Kelly v. United States, 820 F.2d 1173, 1176 (11th Cir. 1987).

In addition to the already deferential standard mandated by Strickland, this Court must also conduct its analysis of Petitioner's claims in light of the procedural posture of this case. As discussed by the Eleventh Circuit,

> it is important to keep in mind that in addition to the deference to counsel's performance mandated by Strickland, the AEDPA adds another layer of deference-this one to a State court's decision-when we are considering whether to grant federal habeas relief from a State court's decision. Thus, [a petitioner] not only has to satisfy the elements of the Strickland standard, but he must also show that the State court applied Strickland to the facts of his case in an objectively unreasonable manner.

Williams v. Allen, 598 F.3d 778, 789 (11th Cir. 2010) (internal quotations, alterations, and citations omitted).

B. Ineffective Assistance of Trial Counsel

As an initial matter, Petitioner claims that his trial counsel, Mr. Edwards and Ms. Stokes, provided constitutionally

28

ineffective assistance. (Doc. 187 at 66.) In particular, Petitioner avers that trial counsel were ineffective for failing to investigate and present mitigating evidence concerning his abusive childhood and his mental health. (Id.) To support his claim, Petitioner generally identifies four errors committed by trial counsel before and during the sentencing phase of trial: (1) trial counsel failed to conduct a meaningful investigation into his background; (2) trial counsel failed to prepare and present his family members as witnesses; (3) trial counsel failed to present evidence concerning Petitioner's sexual abuse; and (4) trial counsel failed to obtain and utilize a mental health expert.[6] (Id. at 125-152.) The Court will address each of Petitioner's arguments in turn.

### 1. Trial Counsels' Failure to Conduct a Meaningful Investigation into Petitioner's Background

Petitioner first argues that trial counsel were ineffective for failing to conduct a meaningful investigation into his background. Petitioner primarily contends that trial counsels'

---

[6] In his brief, Petitioner also argues that trial counsel were ineffective for failing to rebut the State's case for future dangerousness and for failing to request a continuance after Petitioner agreed to allow his counsel to present mitigation evidence. (Doc. 87 at 152, 156.) This Court, however, in its April 3, 2019 order found that Petitioner had improperly pled these claims and therefore Petitioner was not permitted to brief the merits of the claims. (Doc. 81 at 21, 23, 25.) Accordingly, the Court declines to consider Petitioner's arguments about trial counsels' failure to seek a continuance and trial counsels' failure to rebut the State's case for future dangerousness.

investigation was deficient because "almost the entire investigation and development of mitigation [evidence] took place over the course of a weekend in the middle of trial." (Doc. 87 at 190.) In particular, Petitioner focuses on trial counsels' decision to wait until the weekend before the sentencing phase of trial to have Mr. Yungman evaluate Petitioner. (Id. at 131.) Petitioner contends that "[h]ad counsel utilized Mr. Yungman in a timely manner, they unquestionably would have presented a more comprehensive case in mitigation . . . ." (Id. at 189 n.69.)

At the habeas hearing, Petitioner offered affidavit testimony from Mr. Yungman and live testimony from his trial counsel about their preparation for the sentencing phase of trial. In his affidavit, Mr. Yungman stated that his involvement in the case was "highly unusual" because he "did no work on the case until the weekend right before the sentencing trial." (Doc. 14, Attach. 16 at 87.) Mr. Yungman stated that Mr. Edwards did not involve him earlier because Petitioner "was refusing to allow [Mr. Edwards] to present a mitigation case." (Id. at 87.) Mr. Yungman further testified that normally a forensic social worker takes several months to develop a complete social history of a client. (Id.)

Mr. Edwards, during his testimony at the habeas hearing, testified that trial counsel primarily focused their attention on mitigation and the sentencing phase in preparing Petitioner's defense. (Doc. 12, Attach. 6 at 69.) Mr. Edwards felt "urgency and

anxiety about being prepared for the sentencing phase" because Petitioner's decision to plead guilty sped up the pretrial process. (Id. at 84.) Additionally, Mr. Edwards indicated that although Petitioner was reluctant to allow trial counsel to present mitigation evidence, Petitioner was not uncooperative or unwilling to provide counsel with information. (Id. at 75-76.) Mr. Edwards testified that as early as June 2002 he and Ms. Stokes met with Petitioner and began gathering information about his family and prior incarcerations. (Id. at 79-80.) Around the same time, Ms. Stokes began contacting Petitioner's family members. (Id. at 81.) Mr. Edwards testified that in November 2003, approximately five months before trial, Petitioner provided him with a list of family members to contact and interview about Petitioner's background. (Id. at 76-77.) Mr. Edwards noted that although Petitioner provided information about his background to trial counsel, Petitioner remained resistant to trial counsel presenting mitigation evidence throughout preparation for trial. (Id. at 83.)

On review, the state habeas court rejected Petitioner's claim and found that trial counsel did not conduct a deficient investigation into Petitioner's case. (Doc. 22, Attach. 33 at 11.) The state habeas court emphasized that "Petitioner did not want to present any mitigation evidence on his behalf during trial" and that Petitioner "was insistent on that strategy . . . ." (Id.) The state habeas court highlighted that, despite Petitioner's

31

insistence that he did not want to present mitigation evidence,
trial counsel adequately prepared for the sentencing phase by
interviewing Petitioner's family, retaining a forensic
psychologist to evaluate and conduct tests on Petitioner, and
retaining Mr. Yungman to evaluate Petitioner and review
Petitioner's records. (Id.)                    ⅰ

    With respect to Petitioner's specific allegation that trial
counsel should have retained Mr. Yungman earlier in their
investigation, the state habeas court recognized that only "at the
last minute" did Petitioner allow his attorneys to present
mitigating evidence. (Id.) Relying on Strickland, the state habeas
court noted that "[a] defendant's own words and deeds play a role
in assessing the reasonableness of counsel's conduct." (Id. at
10.) The state habeas court further stated that under Morrison v.
State, 258 Ga. 683, 686, 373 S.E.2d 506, 509 (1988), "a mentally
competent defendant's instruction not to investigate or not to
present mitigation evidence may make counsel's decision not to
investigate or present mitigation evidence reasonable." (Doc. 22,
Attach. 33 at 11.) The state habeas court ultimately determined
that "trial counsel conducted a reasonable and competent
investigation of Petitioner's case, despite Petitioner's explicit
desire to enter into a guilty plea and repeated and consistent
instructions to [trial counsel] that he did not want any mitigation
evidence presented in the sentencing phase." (Id. at 10.)

After considering the evidence presented at trial and at the habeas hearing, this Court finds that the state habeas court's finding was not contrary to, or an unreasonable application of federal law or based on an unreasonable determination of fact. In the Court's view, Petitioner has not met the requirements of Strickland.

### a. Deficiency Prong

First, despite Petitioner's focus on what his trial counsel did not do to prepare mitigation evidence, the record is clear that his trial counsel did sufficiently investigate Petitioner's background and that trial counsel began their investigation well before trial started. As early as June 2002, approximately twenty months prior to trial, trial counsel began interviewing Petitioner about his background and gathering records. (Doc. 12, Attach. 6 at 79-80; Doc. 16, Attach. 3 at 22.) Around the same time, trial counsel requested Petitioner's medical records and Petitioner's mother's medical records from Georgia Regional Hospital. (Doc. 19, Attach. 28 at 23.) Trial counsel requested additional records in January 2004, approximately three months prior to trial, concerning Petitioner's schooling, incarceration, and medical history. (Doc. 19, Attach. 28 at 22-23.) In these requests, trial counsel sought records from the Georgia Department of Corrections, Georgia State Prison, Chatham County Detention Center, Memorial Health University Medical Center, St. Joseph's/Candler Hospital,

33

the Board of Education for Savannah-Chatham County, Dr. Larry Ackerman, Dr. Francis P. Rossiter, Jr., Dr. John R. Edgar, Dr. Chang K. Kim, and Dr. Manoj K. Dass.[7] (Id. at 22.)

In October 2003, approximately six months before trial, Ms. Stokes met with Petitioner and obtained information about his father, mother, and stepmother and about the abuse he suffered as a child. (Doc. 16, Attach. 3 at 31-33.) Also during this meeting, Ms. Stokes obtained information from Petitioner about his schooling and his time incarcerated at Arrendale State Prison and the youth detention center. (Id.) On November 21, 2003, Mr. Edwards sent Ms. Stokes a letter listing Petitioner's family members and their contact information that Mr. Edwards obtained. (Id. at 40.) In the months preceding trial, trial counsel interviewed several of Petitioner's family members to collect information about Petitioner's background and childhood. (Doc. 19, Attach. 26 at 65-68; Doc. 17, Attach. 11 at 30-31.) Trial counsels' records also indicate that sometime before January 2004, Ms. Stokes contacted Petitioner's stepmother, but his stepmother stopped responding to Ms. Stokes. (Doc. 16, Attach. 3 at 42.)

---

[7] Trial counsel were unable to obtain records from many of these sources because the records had been destroyed. (See Doc. 19, Attach. 28 at 22-23.) During the habeas proceedings, Mr. Edwards testified that he had never "had a situation before . . . where so many records were unavailable . . . ." (Doc. 17, Attach. 11 at 29-30.)

A few months before trial began, trial counsel also had Petitioner evaluated by Dr. James Maish, a forensic psychologist. Trial counsel arraigned for Dr. Maish to meet with Petitioner several times and had Dr. Maish conduct a battery of tests on Petitioner. (Doc. 14, Attach. 3 at 21; Doc. 19, Attach. 23 at 1, 47, 51, 61, 68, 70.) Dr. Maish ultimately concluded that Petitioner did not suffer from any neurological or intellectual impairment and thus trial counsel decided against presenting Dr. Maish at trial. (Doc. 17, Attach. 11 at 89-90.) Considering that trial counsel thoroughly investigated Petitioner's background several months before trial began, Petitioner cannot show that trial counsels' investigation of mitigation evidence was deficient.

Given what investigation trial counsel did conduct, Petitioner's argument necessarily focuses on the very narrow issue that his trial counsel should have utilized Mr. Yungman earlier in their investigation rather than right before the sentencing phase of trial. Petitioner argues that if Mr. Yungman had more time to conduct his evaluation, then Mr. Yungman could have presented more evidence in mitigation at trial. (Doc. 87 at 189 n.69.) The Court disagrees and, like the state habeas court, concludes that trial counsel hired Mr. Yungman within a reasonable time considering Petitioner's resistance to presenting mitigation evidence.

The record reflects that Petitioner resisted his counsels' efforts to present mitigation evidence throughout trial counsels'

35

entire investigation. In October 2003, Ms. Stokes met with Petitioner and, in her notes, indicated that Petitioner was resistant to arguing mitigation and that Petitioner wanted counsel "to stand by and let the state present its case without input from the defense." (Doc. 16, Attach. 3 at 31.) Ms. Stokes testified during the state habeas proceedings that Petitioner was resistant to trial counsel presenting any mitigation at trial "for the majority of the time that [trial counsel] dealt with him." (Doc. 17, Attach. 11 at 73.) Ms. Stokes believed that Petitioner "saw the mitigation portion as almost asking someone to feel sorry for him and he did not want that." (Id.) Mr. Edwards also sent an email to Mr. Yungman on March 28, 2004, the day before voir dire, and explained to Mr. Yungman that he has not followed-up with Mr. Yungman because Petitioner "had been fully resistant and uncooperative" regarding counsels' effort to present mitigation evidence. (Doc. 17, Attach. 20 at 76.)

Petitioner also told the trial court on numerous occasions that he did not want his trial counsel to present evidence in mitigation.[8] During his pretrial hearing on April 1, 2004, the following exchange occurred:

_____

[8] The Court recognizes that during an ex parte hearing on March 25, 2004, Mr. Edwards indicated that Petitioner would allow trial counsel to present mitigation evidence.

> **Court:** . . . I guess my main concern had been that—I didn't know whether from your answer that meant that you weren't presenting any mitigation witnesses, and that's

**Court:** You don't want [trial counsel] to put on any of the evidence that they've developed to show the jury why the jury should return a verdict of less than death?

**Petitioner:** I don't—I don't want that.

**Court:** Okay. Can you tell me why you don't want that?

**Petitioner:** Well, I don't—I don't feel too enthusiastic about them knowing about my past, my childhood and things like that. I'd rather keep it to myself. It's personal.

**Court:** But you do realize that that increases the chance that the jury could return a verdict of death?

**Petitioner:** Yes, ma'am.

(Doc. 11, Attach. 3 at 14.)

To establish on the record that trial counsel had prepared some mitigation evidence, the trial court permitted trial counsel to make an offer proof of mitigation evidence outside the presence of the jury. The trial court wanted trial counsel to "show that they . . . effectively represented [Petitioner] with regard to

---

not something that the Court wants sprung on it if we get to the penalty phase.
**Mr. Edwards:** Well, Judge, we intend to present mitigating evidence. If we find ourselves unable to do so, that's an issue we're going to have to address with the Court.
**Court:** Yeah, and I don't want to wait until the last minute to address that kind of issue.
**Mr. Edwards:** I don't want to, either, Judge. At this point, I don't think we're going to have to worry about that.
(Doc. 10, Attach. 16 at 4.) Despite this exchange, the record indicates that Petitioner resisted his counsels' efforts to present evidence in mitigation for the majority of the time. As Mr. Edwards stated in his email to Mr. Yungman on March 28, 2004, Petitioner wavered on his stance on mitigation evidence around this time. (Doc. 17, Attach. 20 at 76.)

seeking out mitigation evidence . . . ." (Doc. 11, Attach. 4 at 24.) After trial counsels' offer of proof, Petitioner again confirmed that he would not permit his trial counsel to present mitigation evidence to the jury. (Doc. 11, Attach. 8 at 8.) Finally, after the close of the State's case in aggravation, on April 6, 2004, Petitioner again told the trial court that he did not want his trial counsel to present mitigation evidence:

> **Court:** That's your final decision, Mr. Williams?
>
> **Petitioner:** Yes, ma'am.
>
> **Court:** And you're directing your attorneys not to present evidence in mitigation. Is that right?
>
> **Petitioner:** Yes, ma'am.

(Doc. 11, Attach. 9 at 28.)

Despite Petitioner's repeated refusal to allow mitigation evidence, trial counsel continued to prepare a case in mitigation. On March 31, 2004, trial counsel sent Mr. Yungman Petitioner's records.[9] (Doc. 15, Attach. 1 at 42.) On April 1, the day after Petitioner's exchange with the trial court wherein he expressly stated that he did not want trial counsel to present mitigation

---

[9] Trial counsel initially contacted Mr. Yungman as early as June 26, 2002 and indicated that they wanted to retain Mr. Yungman for Petitioner's "defense team-mitigation division." (Doc. 16, Attach. 3 at 50.) As Mr. Edwards suggested in his email to Mr. Yungman on March 28, 2004, trial counsel did not send Mr. Yungman Petitioner's records earlier because Petitioner was refusing to allow trial counsel to present mitigation evidence. (Doc. 17, Attach. 20 at 76.)

evidence, trial counsel had Mr. Yungman interview Petitioner for eight hours, interview Petitioner's family for several hours, and review Petitioner's records to prepare mitigation evidence. (Doc. 17, Attach. 20 at 4.) The state habeas court ultimately concluded that any delay in utilizing Mr. Yungman's services was not deficient, especially considering Petitioner's continued resistance to the presentation of mitigation evidence.

Petitioner contends that, although he resisted the presentation of mitigation evidence, "the state habeas court made an unreasonable factual determination in finding that [Petitioner] obstructed" trial counsels' investigation. (Doc. 87 at 178.) Yet, the state habeas court did not find that Petitioner "obstructed" trial counsels' investigation. Rather, the state habeas court acknowledged that "Petitioner did not wish to present mitigation evidence and was adamant in that position until the night before he was required to go forward." (Doc. 22, Attach. 33 at 11-12.) The state habeas court, in its denial of Petitioner's claim, did not determine that Petitioner ever obstructed or prevented trial counsel from investigating mitigation evidence. Rather, the state habeas court found that trial counsels' investigation was reasonable in light of Petitioner's resistance to presenting mitigation. The state habeas court's factual determination on this issue is supported by the record and is certainly not objectively

unreasonable. Accordingly, Petitioner's argument on this issue is without merit.[10]

Petitioner also contends that the state habeas court "simply ignored the fact that almost the entirety of [trial counsels'] mitigation case was developed over the weekend between the

---

[10] To the extent that Petitioner argues the state habeas court's decision does not deserve AEDPA deference because it does not explain each fact it considered in making its decision, Petitioner's argument fails. "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." Harrington v. Richter, 562 U.S. 86, 98, 131 S. Ct. 770, 784, 178 L. Ed. 2d 624 (2011). "That does not mean we are to flyspeck the state court order or grade it . . . ." but rather "it means is [the Court is] to focus not merely on the bottom line ruling of the decision but on the reasons, if any, given for it." Meders v. Warden, Ga. Diagnostic Prison, 911 F.3d 1335, 1350 (11th Cir. 2019). The Eleventh Circuit has explicitly rejected "the proposition that a state court decision involves an unreasonable application of federal law and is not entitled to deference unless that court's opinion on its face 'shows its work' by explicitly mentioning 'all relevant circumstances' that the defendant argues in support of relief." Id. (citing Lee v. Comm'r, Ala. Dep't of Corr., 726 F.3d 1172, 1211 (11th Cir. 2013)). The Eleventh Circuit has emphasized that district courts are "not to read state court opinions as if we were grading papers." Rimmer v. Sec'y, Fla. Dep't of Corr., 876 F.3d 1039, 1055 (11th Cir. 2017) (quotation marks omitted); see also, e.g., Jones v. Sec'y, Fla. Dep't. of Corr., 834 F.3d 1299, 1311 (11th Cir. 2016) ("[W]e have cautioned that overemphasis on the language of a state court's rationale would lead to a grading papers approach that is outmoded in the post-AEDPA era."). Although the state habeas court could have more thoroughly explained its reasoning, the state court's opinion provides a sufficient basis for the Court to determine which facts it relied upon in denying Petitioner's claims. The Court specifically found that trial counsels' investigation was sufficient, "and it did so after recounting all of the measures counsel undertook to uncover information about" Petitioner's background. Gissendaner v. Seabolt, 735 F.3d 1311, 1329 (11th Cir. 2013) (concluding that the state habeas court's opinion did not "presuppose the reasonableness" of trial counsel's investigation).

conclusion of voir dire and the evidentiary portion of trial."
(Doc. 87 at 187.) And Petitioner asserts that the state habeas
court's denial of Petitioner's claim on this issue was unreasonable
in light of the Supreme Court's decision in Williams v. Taylor,
529 U.S. 362, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000). In the
Court's view, however, Williams v. Taylor is materially
distinguishable from Petitioner's case.

In Williams v. Taylor, trial counsel did not begin preparing
mitigation evidence until a week before the start of the sentencing
phase of trial. 529 U.S. 362, 395, 120 S. Ct. 1495, 1514. At the
sentencing phase of trial, counsel offered the testimony of the
petitioner's two neighbors and mother, and a taped excerpt from a
statement by a psychiatrist, who generally described the
petitioner as a nice boy who was not violent. Id. at 369, 120 S.
Ct. at 1500. Counsel, however, failed to discover records showing
that the petitioner had been "severely and repeatedly beaten by
his father" and that the petitioner's parents were imprisoned for
two years for criminal neglect of the petitioner and his siblings.
Id. Additionally, counsel failed to introduce evidence that the
petitioner was "borderline mentally retarded and did not advance
beyond sixth grade in school." Id. at 396, 120 S. Ct. at 1514
(quotation marks omitted). The Supreme Court ultimately found that
the petitioner had established that his counsel performed
deficiently because, based on the difference between the evidence

presented at trial and the evidence produced during post-conviction proceedings, "trial counsel did not fulfill their obligation to conduct a thorough investigation of the [petitioner's] background." Id. at 396, 120 S. Ct. at 1514-15.

Unlike counsel in Williams v. Taylor, trial counsel in Petitioner's case began investigating and developing mitigation evidence at least six months before the sentencing phase of trial. Trial counsel requested numerous records pertaining to Petitioner's background, discovered that Petitioner suffered severe abuse as a child, interviewed Petitioner and several of his family members, and had Petitioner evaluated by a forensic psychologist. Although trial counsel did not have Mr. Yungman interview Petitioner until five days before the sentencing phase of trial, this delay was a direct result of Petitioner's resistance to presenting mitigation evidence.

It is true that, "[i]n death penalty cases, trial counsel is obligated to investigate and prepare mitigation evidence for his client." Krawczuk v. Sec'y, Fla. Dep't of Corr., 873 F.3d 1273, 1292 (11th Cir. 2017) (citing Porter v. McCollum, 558 U.S. 30, 39-40, 130 S. Ct. 447, 453, 175 L. Ed. 2d 398 (2009)). However, " 'the scope of the duty to investigate mitigation evidence is substantially affected by defendant's actions, statements, and instructions.' Id. (quoting Cummings v. Sec'y for Dep't of Corr., 588 F.3d 1331, 1357 (11th Cir. 2009)). "When a competent defendant

42

clearly instructs counsel either not to investigate or not to present any mitigating evidence, 'the scope of counsel's duty to investigate is significantly more limited than in the ordinary case.' " Id. at 1293 (quoting Cummings v. Sec'y, Dep't of Corr., 588 F.3d 1331, 1358-59 (11th Cir. 2009)); see also Blankenship v. Hall, 542 F.3d 1253, 1277 (11th Cir. 2008) ("Significant deference is owed to failures to investigate made under a client's specific instructions not to involve his family."); Newland v. Hall, 527 F.3d 1162, 1202 (11th Cir. 2008) ("We have also emphasized the importance of a mentally competent client's instructions in our analysis of defense counsel's investigative performance under the Sixth Amendment."). Considering Petitioner's resistance to mitigation evidence and trial counsels' efforts despite this resistance, circumstances not present in Williams v. Taylor, the Court finds that the state habeas court's denial of Petitioner's claim was not contrary to, or an unreasonable application of federal law or based on an unreasonable determination of fact.[11]

---

[11] Petitioner briefly argues that the state habeas court misapplied Supreme Court law because it failed to consider the ABA Guidelines as guides to standards of practice. (Doc. 87 at 176.) This Court does not agree that the state habeas court was required to consider the ABA Guidelines in deciding trial counsels' effectiveness. The Supreme Court has been clear that "[t]he ABA Guidelines do not establish independent standards for counsel; rather, they are merely guides to be considered in determining whether an attorney's conduct was reasonable." Anderson v. Sec., Fla. Dep't of Corr., 752 F.3d 881, 904 (11th Cir. 2014) (citing Strickland, 466 U.S. at 688, 104 S. Ct. at 2065 ("Prevailing norms as reflected in American Bar Association standards and the like . . . are guides to

b. <u>Prejudice Prong</u>

Nevertheless, even if Petitioner had shown that trial counsels' investigation and preparation for mitigation was deficient, Petitioner has not shown that he was prejudiced by such deficiency. Unlike the case in <u>Williams v. Taylor</u>, "this is not a case where the additional evidence presented in the state collateral proceeding 'adds up to a mitigation case that bears no relation' to the mitigation case 'actually put before the jury.'" <u>Holsey v. Warden, Ga. Diagnostic Prison</u>, 694 F.3d 1230, 1272 (11th Cir. 2012) (quoting <u>Rompilla v. Beard</u>, 545 U.S. 374, 393, 125 S. Ct. 2456, 162 L. Ed. 2d 360 (2005)). Here, Mr. Yungman, even with minimal preparation, presented a complete and detailed picture of Petitioner's nightmarish childhood. The state habeas court highlighted that Mr. Yungman's "testimony was very detailed and covered Petitioner's entire life." (Doc. 22, Attach. 33 at 12.) As detailed more fully in the following sections, when the mitigating evidence at trial and the mitigating evidence presented at the

---

determining what is reasonable, but they are only guides."); <u>see also</u> <u>Bobby v. Van Hook</u>, 558 U.S. 4, 8-9, 130 S. Ct. 13, 17, 175 L. Ed. 2d 255 (2009) (rejecting the treatment of ABA Guidelines as "inexorable commands with which all capital defense counsel must fully comply" (internal quotation marks omitted)); <u>Dill v. Allen</u>, 488 F.3d 1344, 1362 n.48 (11th Cir. 2007) (recognizing that "the Supreme Court has not made [the ABA guidelines] the law of the land" and declining to adopt 2003 Guidelines as standard for reasonableness). Accordingly, the state habeas court's decision is not automatically unreasonable because it failed to consider the ABA Guidelines.

state habeas proceeding are placed side-by-side, the state habeas court was not unreasonable in its determination that the post-conviction evidence was simply cumulative of that presented by Mr. Yungman at the sentencing phase. Consequently, Petitioner's argument that trial counsel were ineffective by failing to conduct a comprehensive investigation into his background and failing to timely utilize Mr. Yungman must fail.[12]

## 2. Failure to Utilize Family Members as Witnesses

Next, Petitioner asserts that trial counsel were ineffective for failing to offer Petitioner's family members' testimony during the sentencing phase of trial. (Doc. 87 at 138-139.) Specifically, Petitioner contends that trial counsel should have presented Petitioner's family members as witnesses to testify about Petitioner's traumatic childhood. (Id. at 139.) Petitioner further argues that trial counsels' failure to present Petitioner's family members "was unreasonable in light of the emotional and detailed accounts they were uniquely situated to provide to the jury." (Id.)

---

[12] In his brief, Petitioner also argues that trial counsels' investigation was deficient because they failed to utilize Paige Tarr, a mitigation specialist, after trial counsel requested and received funds to hire Ms. Tarr. (Doc. 87 at 128.) Petitioner, however, fails to offer any evidence that trial counsel could have discovered had they retained Ms. Tarr. Petitioner conclusively states that Ms. Tarr could have assisted trial counsel in developing Petitioner's mitigation case, but Petitioner fails to explain how Ms. Tarr could have helped in his defense. (Doc. 87 at 128.) Accordingly, the Court finds that Petitioner's argument that trial counsel were deficient for failing to utilize Ms. Tarr fails.

Although not entirely clear from Petitioner's brief, Petitioner seems to argue that his trial counsel were deficient for failing to prepare Petitioner's family members to testify and that trial counsels' decision not to call the family members to testify prejudiced Petitioner. In his brief, Petitioner claims that "[Mr.] Yungman's condensed version of [Petitioner's] horrifying childhood failed to convey the uniquely severe abuses that [Petitioner] endured and lacked any power to move jurors to view [Petitioner] in a sympathetic light . . . ." and that Petitioner's "family members' testimony would have corroborated, explained, and expanded on Mr. Yungman's testimony . . . ." (Id. at 139, 141.) Petitioner contends that his family members' emotional testimony would have bolstered the defense's theme of mercy and that, because trail counsel did not prepare his family to testify, trial counsel failed to present any witness with the personal connection to Petitioner to make a credible plea for mercy. (Id. at 142-143.) After careful consideration, the Court disagrees with Petitioner.

To support this claim at the state habeas proceeding, Petitioner presented the live testimony of three family members—Tynese Williams, Petitioner's sister; Tina Williams, Petitioner's sister; and Deborah Johnson, Petitioner's cousin—and the affidavit testimony of several family members—Patricia Williams, Petitioner's aunt; Diallow Johnson, Petitioner's cousin; Raymond

46

Williams, Jr.; Petitioner's brother; and Rebecca McCray, Petitioner's sister. (Doc. 12, Attach. 4 at 37-83; Doc. 14, Attach. 1.) Petitioner's family members provided first-hand accounts about the severe abuse Petitioner suffered during his childhood.

Despite the family members' testimony at the habeas hearing, the state habeas court rejected Petitioner's allegation that his trial counsel were ineffective for failing to prepare and present Petitioner's family members as witnesses. (Doc. 22, Attach. 33 at 12.) The state habeas court noted that Petitioner's trial counsel interviewed Petitioner's family members about his childhood in preparation for trial, but trial counsel had concerns about certain family members testifying during the sentencing phase. (Id. at 11-12.) The state habeas court further highlighted that Petitioner's family members were present in the courtroom during the sentencing phase of trial and that trial counsel and Mr. Yungman pointed them out to the jury. (Id. at 12.) The state habeas court also acknowledged that "Mr. Yungman presented much of the evidence that the family members would have presented" and that "[h]is testimony was very detailed and covered Petitioner's entire life." (Id.) Based on these facts, the state habeas court found "[t]he failure to present family members as witnesses did not deprive [Petitioner] of a fair trial. (Id.)

After careful review of the evidence presented at trial and at the post-conviction hearing, this Court finds that the state

47

habeas court's finding was not contrary to, or an unreasonable application of, federal law or based on an unreasonable determination of fact. In the Court's view, Petitioner has not met the requirements of <u>Strickland</u>.

a. Deficiency Prong

First, with respect to Petitioner's argument that his trial counsel were deficient for not preparing his family members to testify, Petitioner argues that the state habeas court's decision was an unreasonable application of <u>Strickland</u>. (Doc. 87 at 200.) Specifically, Petitioner contends that the state habeas court unreasonably concluded that trial counsels' decision to not offer the family members as witnesses was strategic because "[t]rial counsel's failure to prepare a witness . . . cannot be the basis for a strategic reason not to present" the witness at trial. (<u>Id.</u>)

Despite Petitioner's assertions, this is not a case where trial counsel completely failed to utilize Petitioner's family members to investigate Petitioner's childhood. <u>See</u>, <u>e.g.</u>, <u>Johnson v. Sec'y, Dep't. of Corrs.</u>, 643 F.3d 907, 932 (11th Cir. 2011) (finding trial counsels' preparation deficient where counsel did not interview anyone about petitioner's background even though the petitioner "told [trial counsel] he had a bad childhood, including an alcoholic and abusive father who would abandon the family"); <u>Williams v. Allen</u>, 542 F.3d 1326, 1340 (11th Cir. 2008) (concluding trial counsel's performance was deficient because "despite the

48

availability of several of [the petitioner's] family members, trial counsel sought mitigating evidence from only one person with firsthand knowledge of his background" and "[b]y choosing to rely entirely on her account, trial counsel obtained an incomplete and misleading understanding of [the petitioner's] life history"). In contrast, the record in this case clearly establishes that trial counsel utilized Petitioner's family members to gather relevant and mitigating information about Petitioner's background.

Notably, months before the sentencing phase of trial, trial counsel interviewed Petitioner and his family members to gather information about Petitioner's background. (Doc. 19, Attach. 26 at 65-68; Doc. 17, Attach. 11 at 30-31.) Mr. Edwards also requested records from Petitioner's sister such as photographs and school certificates. (Doc. 17, Attach. 11 at 32.) Mr. Edwards testified that, during his meetings with Petitioner's siblings, he asked them questions about their childhood, Petitioner's experiences, and whether DFACS was ever involved in the family. (Id. at 33.) Petitioner's trial counsel also arranged for Mr. Yungman to interview several of Petitioner's siblings to collect more information about Petitioner's background. (Doc. 14, Attach. 16 at 87.)

Despite trial counsels' extensive efforts to collect information from Petitioner's family members prior to trial, Petitioner takes issue with trial counsels' failure to prepare

49

Petitioner's family members to testify. (Doc. 87 at 143.) Petitioner, however, fails to acknowledge that he resisted trial counsels' effort to present mitigation evidence until the close of the State's case in aggravation. Mr. Edwards testified during the habeas hearing that preparing a witness is "generally something that takes a while" and requires "actual practice rehearsal . . . ." (Doc. 12, Attach. 6 at 93.) The Court cannot fault trial counsel for failing to spend substantial time preparing Petitioner's family members when Petitioner did not want any mitigation evidence presented at trial. See Strickland, 466 U.S. at 691, 104 S. Ct. at 2066 ("The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions.").

Mr. Edwards testified at the habeas hearing that, even after Petitioner permitted trial counsel to present mitigation evidence, trial counsel were still hesitant to allow Petitioner's family members to testify. (Doc. 17, Attach. 11 at 43.) Mr. Edwards testified that Petitioner's sister, Tina Williams, "seemed to really care deeply for [Petitioner] but she was a loose, loose cannon" and Mr. Edwards "had some concerns about what she would do if she took the stand . . . ." (Id.) In particular, Mr. Edwards was concerned that Tina Williams would have said "things such as, well, he didn't do this, he never would have done this . . . ." (Doc. 13, Attach. 2 at 48.) Mr. Edwards noted that "in a case like

50

this, where [the Petitioner] pled guilty, that sort of [blame-casting] could have been . . . very negative and could have undermined the credibility of other things" that Tina Williams may have said.[13] (Id.)

Despite trial counsels' decision not to prepare Petitioner's family members to testify, trial counsel did not enter the sentencing phase without assistance from Petitioner's family members. In addition to presenting the information that trial counsel collected from the family through Mr. Yungman's testimony, trial counsel had Petitioner's family members present in the courtroom and had Mr. Yungman introduce each family member to the jury. (Doc. 11, Attach. 11 at 1 (Q: ". . . Do you recognize some of the family members that you had the opportunity to interview?" A: "Yes, I do." Q: "Do you know who they are? Which particular family members they are?" A: "I know Sheldon and Tina and Sherry and Tan[e]s[e] and Rebecca . . . .").)

"Which witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess." Waters v. Thomas, 46 F.3d 1506, 1512 (11th Cir. 1995). In the Court's view, trial counsels'

---

[13] The Court notes that Mr. Edwards also acknowledged that more preparation of a witness could help minimize the risk that a witness would engage in blame-casting. (Doc. 13, Attach. 2 at 48.) As explained, however, trial counsels' failure to prepare Petitioner's family members as witnesses was not deficient.

decision not to prepare the family members to testify before
Petitioner decided to allow mitigation evidence was not
unreasonable. Likewise, trial counsels' decision to omit the
family members' testimony after Petitioner decided to allow
mitigation evidence was a strategic decision. Trial counsel made
this strategic decision after several interviews with Petitioner's
family members and in light of the fact that Mr. Yungman would
testify at trial about the information collected from interviews
of Petitioner's family. Strategic choices made after thorough
investigation of the law and facts "are virtually
unchallengeable." Strickland, 466 U.S. at 690, 104 S. Ct. at 2066.
Accordingly, the Court agrees with the state habeas court that
trial counsels' decision to not prepare Petitioner's family
members to testify at the sentencing phase of trial was not
deficient.

### b. Prejudice Prong

Second, this Court finds that Petitioner was not prejudiced
by trial counsels' decision to not have Petitioner's family members
testify. Where " 'new' evidence largely duplicate[s] the
mitigation evidence at trial," . . . "[t]here is no reasonable
probability that the additional evidence [the Petitioner]
presented in his state habeas proceedings would have changed the
jury's verdict." Cullen v. Pinholster, 563 U.S. 170, 200, 131 S.
Ct. 1388, 1410, 179 L. Ed. 2d 557 (2011).

To determine whether the state habeas court's cumulative conclusion was unreasonable, the Court will "compare the trial evidence with the evidence presented during the state postconviction proceedings." Holsey, 694 F.3d at 1260. In doing so, the Court shall

> keep in mind that the United States Supreme Court, [the Eleventh Circuit], and other circuit courts of appeals generally hold that evidence presented in postconviction proceedings is "cumulative" or "largely cumulative" to or "duplicative" of that presented at trial when it tells a more detailed version of the same story told at trial or provides more or better examples or amplifies the themes presented to the jury.

Holsey, 694 F.3d at 1260-62 (citing Cullen, 563 U.S. at 200, 131 S. Ct. at 1409-10) (finding new evidence largely cumulative because "[d]eclarations from [the petitioner]'s siblings support his mother's testimony that his stepfather was abusive and explain that [the petitioner] was beaten with fists, belts, and even wooden boards")); see also Wong, 558 U.S. at 22-23, 130 S. Ct. at 387-88 (holding that "[s]ome of the [additional mitigating] evidence was merely cumulative of the humanizing evidence [the petitioner] actually presented" because "[t]he sentencing jury was . . . well acquainted with [the petitioner's] background and potential humanizing features") (quotation marks omitted); Boyd v. Allen, 592 F.3d 1274, 1297-98 (11th Cir. 2010) (finding that much of the evidence presented by the petitioner during post-conviction proceedings "was in some measure cumulative" of the trial evidence

because "much (although not all) of the 'new' testimony introduced at the post-conviction hearing would simply have amplified the themes already raised at trial"); Baldwin v. Maggio, 704 F.2d 1325, 1334 (5th Cir. 1983) (holding that a petitioner was not prejudiced by his counsel's failure to present "largely cumulative" evidence from several witnesses because "[t]heir testimony would have served only to corroborate the portrait of the man sketched by" other witnesses who had testified at sentencing).

As noted by the state habeas court, Mr. Yungman presented largely the same testimony at trial that Petitioner's family offered during the state habeas hearing. At the sentencing phase of Petitioner's trial, Mr. Yungman testified extensively about Petitioner's abusive and neglectful parents. Mr. Yungman testified that Petitioner suffered severe and frequent abuse from his father and stepmother and that he obtained this information from Petitioner's siblings and Petitioner himself. Petitioner avers, however, that at the state habeas hearing he presented a more detailed and emotionally compelling version of his abusive childhood through the testimony of his family members. (Doc. 87 at 143.) He argues that because his family's first-hand accounts of the abuse would have compelled the jury to sentence Petitioner to life, the state habeas court's cumulative conclusion is unreasonable. (Id. at 194.) The Court disagrees with Petitioner because, when compared side-by-side, the testimony offered by

Petitioner's family members at the habeas hearing largely duplicates the testimony offered by Mr. Yungman at trial and merely "amplifies the themes presented to the jury." Holsey, 694 F.3d at 1260-62.

At the state habeas proceeding, Petitioner presented the live testimony of his two sisters, Tynese Williams and Tina Williams, and his cousin, Deborah Williams.[14] Tynese and Tina both testified that Petitioner's parents treated Petitioner worse than the other children and that Petitioner was the "target" of their parents' abuse. (Doc. 12, Attach. 4 at 41, 56.) On the same note, Mr. Yungman testified at trial that Petitioner was "targeted and tormented by his stepmother" and that Petitioner's sister used

_____

[14] The Court will only compare Mr. Yungman's testimony to that of Petitioner's family members who testified live at the state habeas hearing. In his brief, Petitioner mainly argues that his family's live testimony would have emotionally compelled the jury more than Mr. Yungman's testimony. (Doc. 87 at 139 ("Trial counsel's failure to present any of [Petitioner's] family members to testify about [Petitioner's] nightmarish childhood was unreasonable in light of the emotional and detailed accounts they were uniquely situated to provide to the jury.").) Affidavits, like those Petitioner's family members submitted to the state habeas court, could not have had the emotional impact on a jury that Petitioner argues trial counsel neglected to offer at trial. Accordingly, the Court finds that the affidavit testimony from Petitioner's family members does not support his argument that Petitioner was prejudiced because trial counsel failed to present emotionally compelling testimony to the jury. Affidavit testimony could not have "move[d] jurors to view [Petitioner] in a sympathetic light" any more than Mr. Yungman's testimony about Petitioner's abusive childhood, especially considering that Mr. Yungman's testimony largely mirrored the affidavit testimony offered to the state habeas court.

those exact words to describe Petitioner's abuse during her pre-trial interview with Mr. Yungman. (Doc. 11, Attach. 10 at 65-66.)

Next, Tynese testified at the habeas hearing that their stepmother made Petitioner stand on a doorknob with a tie wrapped around his neck so that if he stepped off the knob, he would hang himself. (Doc. 12, Attach. 4 at 41-42.) At trial, Mr. Yungman described the same incident, stating that Petitioner's stepmother "somehow hung him up from a door with a rope around his neck with his feet on the doorknob so that if he would move off of the doorknob, then he would choke himself." (Doc. 11, Attach. 10 at 67.)

Tynese and Tina also testified that, when Petitioner wet the bed as a child, their stepmother made him sleep in the closet on top of his soiled clothes. (Doc. 12, Attach. 4 at 43, 58-59.) Tynese described the closet as very small and stated that Petitioner could not stretch out. (Id. at 43.) Likewise, Mr. Yungman testified at trial that Petitioner's stepmother "made him sleep in a closet on wet clothes" and that she would "wrap up the wet bedding, throw it in the closet, and throw [Petitioner] in the closet on top of the . . . wet bed clothes." (Doc. 11, Attach. 10 at 66.) Tina and Tynese both also testified that their stepmother sometimes made Petitioner sleep under the house. (Doc. 12, Attach. 4 at 45-46, 58.) Likewise, Mr. Yungman testified that Petitioner's

stepmother made him sleep under the house. (Doc. 11, Attach. 10 at 66.)

Additionally, Tynese, Tina, and Deborah testified that Petitioner's stepmother would beat Petitioner with belts, switches, and rubber, and that the beatings would leave thick, bloody bruises on Petitioner's body. (Doc. 12, Attach. 4 at 44, 47, 77.) They also described how Petitioner's stepmother once hung Petitioner from a clothesline behind their house. (Id. at 44-45, 56.) In like manner, Mr. Yungman testified at trial that Petitioner's stepmother whipped Petitioner and sometimes did so with an extension cord. (Doc. 11, Attach. 10 at 66.) And Mr. Yungman detailed how Petitioner "was hung on a clothesline outside his house in his wet clothes to – to dry out between two pecan trees that are in the backyard." (Id. at 67.) Mr. Yungman even "went to his house . . . and observed the backyard" and confirmed that "there are two pecan trees and a clothesline in the backyard." (Id. at 67.)

Concerning Petitioner's father, Tina and Tynese testified that their father frequently beat Petitioner with belts, switches, a piece of a tire, a water hose, and that these beatings would leave thick, bloody bruises and burns on Petitioner's body. (Doc. 12, Attach. 4 at 60.) So too, Mr. Yungman testified at trial that Petitioner's father beat Petitioner "with switches, with a water hose, with a belt called the Great White Hope, which is a belt

57

that apparently left white welt marks on [Petitioner's] body
. . . ." (Doc. 11, Attach. 10 at 67.) Mr. Yungman elaborated that
Petitioner's father beat him with "a piece of tire which he somehow
developed with a handle that he'd wrap around his hand and then
use part of the tire to whip [Petitioner]." (Id. at 67.)

As a final example, Tina testified that their father once
tied Petitioner to a tree and beat him. (Doc. 12, Attach. 4 at
61.) And just as described by Tina, Mr. Yungman testified at trial
how Petitioner's father would "tie [Petitioner] to the pecan tree
and – and whip him . . . . [Petitioner] described these as whippings
or beatings where he would bleed."[15] (Doc. 11, Attach. 10 at 67-
68.) Mr. Yungman also explained that Petitioner's medical records
showed that Petitioner had extensive scarring on his body from the
abuse. (Id. at 68-69.)

All in all, the evidence offered at the state habeas
proceeding by Petitioner's family "largely duplicates" Mr.
Yungman's testimony at trial about Petitioner's abusive childhood.

---

[15] During his testimony at trial, Mr. Yungman also described several
instances of abuse that were not described by Petitioner's family
who testified live at the state habeas hearing. For example, Mr.
Yungman stated that Petitioner's stepmother "hit him in the head
once with a ball peen hammer and . . . [when Petitioner] did not
separate the laundry . . . [his stepmother] took him in the
bathroom and stuck a plunger down his throat as punishment . . . ."
(Doc. 11, Attach. 10 at 67.) Although Petitioner's family members
described these instances of abuse in affidavits submitted to the
state habeas court (Doc. 14, Attach. 1 at 13), Petitioner cannot
argue that his family's affidavit testimony would have been more
emotionally compelling than Mr. Yungman's live testimony.

Duplicative testimony such as Petitioner's family members' testimonies at the habeas hearing that simply "tells a more detailed version of the same story told at trial" and "amplifies the themes presented to the jury" is not sufficient to establish prejudice. Holsey, 694 F.3d at 1260-62.

In his briefing, Petitioner does not offer evidence of any instances of abuse that trial counsel failed to discover or that Mr. Yungman failed to offer during his testimony at trial. Instead, Petitioner mainly argues that the jury could have considered testimony from Petitioner's family members more credible than testimony from Mr. Yungman. (Doc. 87 at 142.) Particularly, Petitioner highlights that the State questioned the credibility of Mr. Yungman's testimony at trial because the State argued in closing that the jury "didn't get an accurate picture, really, of [Petitioner's] bringing up through interviews by the gentleman who testified about talking to siblings." (Doc. 87 at 142; Doc. 11, Attach. 11 at 38.) Trial counsel, however, bolstered Mr. Yungman's credibility at trial by having him introduce Petitioner's family members that were present in the courtroom and name the family members who he interviewed. (Doc. 11, Attach. 11 at 1.)

Additionally, Petitioner has not shown that his family members' testimony would have changed the outcome of this case considering the substantial aggravating evidence the State offered against Petitioner. Petitioner pled guilty to the murder of Mr.

Deal and, during the sentencing phase of trial, the State presented
Petitioner's confession to the murder of Mr. Deal. (Doc. 11,
Attach. 5 at 74-81.)  The State also presented evidence that
Petitioner murdered Iris Hall and Taureen Graham in 1999, including
Petitioner's confession to the murders. (Doc. 11, Attach. 7 at 29-
31.) Additionally, the State presented evidence that in 2003, after
Petitioner murdered Mr. Deal, Petitioner stabbed two inmates at
Georgia State Prison, killing one and severely injuring another.
(Doc. 11, Attach. 8 at 31-46.) The jury also heard that, during an
interview with a special agent of the Georgia Bureau of
Investigation, Petitioner admitted that he had planned to kill
both inmates and that he stabbed the inmate who died at "every
opportunity [he] had, until [the inmate] lost his energy." (Id. at
75-76, 85.)

Along with evidence about Petitioner's four murders, the
State presented evidence that Petitioner attacked his attorney
during an interview at the jail and slashed a prison guard's face
and throat. (Doc. 11, Attach. 7 at 8-10, 10-13.) Also, the State
presented evidence of an armed robbery that Petitioner committed
in 1999 and of a threatening letter that Petitioner sent to a woman
who escaped the scene of Petitioner's 1999 murders. (Id. at 14-
22, 41-47.) All in all, the State presented convincing evidence
that Petitioner is a violent inmate who is not deterred from
criminal activity while incarcerated. Petitioner "cannot prevail

60

[on his ineffective assistance claim] simply by demonstrating that '[counsels' error] had some conceivable effect on the outcome of the proceedings.' " <u>Anderson v. Sec., Fla. Dep't of Corr.</u>, 752 F.3d 881, 904 (11th Cir. 2014) (quoting <u>Strickland</u>, 466 U.S. at 693, 104 S. Ct. at 2067). In the Court's view, Petitioner has not shown "a reasonable probability 'that, absent the error[], the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.' " <u>Id.</u> (quoting <u>Strickland</u>, 466 U.S. at 695, 104 S. Ct. at 2069). Accordingly, counsel was not deficient for failing to have family members testify, and, even if they were deficient, the Court finds their decision did not prejudice Petitioner.

### 3. Failure to Present Evidence of Sexual Trauma

Next, Petitioner argues that trial counsel were ineffective for omitting evidence of the sexual abuse that Petitioner suffered during his childhood and during his time in correctional facilities. (Doc. 87 at 100, 135.) In particular, Petitioner argues that because trial counsel failed to present evidence about Petitioner's sexual trauma to the jury, the state habeas court's unreasonably concluded that the evidence presented during the habeas hearing was largely cumulative. (Doc. 94 at 19.)

During the state habeas proceeding, Petitioner presented evidence that he suffered sexual abuse when he was a child, when he was housed at a youth detention facility, and when he was housed

at Arrendale State Prison. Specifically, Dr. Lisak testified that Petitioner told him that, as a child, he was sexually abused by a female neighbor for several years and that Petitioner was sexually abused by two other males in his neighborhood. (Doc. 12, Attach. 6 at 31-33.)

Petitioner also submitted several affidavits concerning sexual trauma that he suffered while housed in correctional facilities. First, Stanley Freeman, Petitioner's friend, stated in an affidavit that Petitioner was raped by two older boys in a youth detention facility. (Doc. 14, Attach. 1 at 70.) Second, Mr. Freeman and Christopher Nesbitt, Petitioner's friend, stated in affidavits that Petitioner was raped while incarcerated in Arrendale State Prison. (Id. at 70-71; Doc. 16, Attach. 3 at 70.) During Petitioner's interview with Dr. Lisak, however, Petitioner denied that he suffered any sexual abuse or rape while housed in the correctional facilities. (Doc. 12, Attach. 6 at 91-62.)

In its final order, the state habeas court did not squarely address Petitioner's sexual abuse. Rather, the state habeas court only discussed Petitioner's claim that trial counsel failed to present a prison conditions expert to testify about the conditions of Arrendale State Prison. (Doc. 22, Attach. 33 at 13.) Because the state habeas court never reached the merits of Petitioner's ineffective assistance of counsel claim based on trial counsels' failure to present evidence of Petitioner's sexual trauma, the

Court must review this claim de novo. See Cone v. Bell, 556 U.S. 449, 472, 129 S. Ct. 1769, 1784, 173 L. Ed 2d 701 (2009) (finding that a claim must be reviewed de novo after the state court failed to reach the merits of the claim). After careful review of the evidence presented at trial and at the habeas hearing, the Court finds that Petitioner has failed to satisfy the requirements of Strickland.

### a. Deficiency Prong

First, trial counsel could not have been expected to discover and develop evidence of Petitioner's sexual abuse because Petitioner failed to inform trial counsel about such abuse. See Williams v. Head, 185 F.3d 1223, 1237 (11th Cir. 1999) ("An attorney does not render ineffective assistance by failing to discover and develop evidence of childhood abuse that his client does not mention to him."). "[T]he scope of the duty to investigate mitigation evidence is substantially affected by the [Petitioner's] actions, statements, and instructions." Cummings, 588 F.3d at 1357 (citing Strickland, 466 U.S. at 691, 104 S. Ct. at 2066)). This is not a case where Petitioner mentioned to trial counsel that he had been sexually abused and trial counsel failed to thoroughly investigate Petitioner's allegations. Instead, Petitioner did not tell trial counsel about any instances of sexual abuse despite having numerous occasions to do so. Petitioner also did not reveal the sexual abuse to Mr. Yungman during their

63

approximately eight-hour interview about Petitioner's background. See Stewart v. Sec'y, Dep't of Corr., 476 F.3d 1193, 1215 (11th Cir. 2007) ("[Trial counsel's] failure to present evidence of [the petitioner's] alleged abuse was not deficient because [petitioner] did not inform [trial counsel] of this abuse.); Van Poyck v. Fla. Dep't of Corr., 290 F.3d 1318, 1324 (11th Cir. 2002) (denying ineffective assistance of counsel claim concerning counsel's failure to present evidence of petitioner's childhood abuse because "the evidence was not known to [c]ounsel at the time of the penalty phase; and the failure to know of it was not the result of a constitutionally deficient investigation").

Trial counsels' investigation of Petitioner's background also did not uncover evidence of Petitioner's sexual trauma. Petitioner's family members did not allege that Petitioner had been sexually assaulted nor did any of Petitioner's records reveal evidence of sexual assault. See Gissendaner v. Seabolt, 735 F.3d 1311, 1329-30 (11th Cir. 2013) (affirming district court's denial of petitioner's ineffective assistance claim even where petitioner told counsel she was sexually abused as a child because counsel's investigation uncovered no evidence to support the petitioner's allegations). Because trial counsel had no reason to know that Petitioner experienced sexual abuse, trial counsels' failure to present evidence about Petitioner's sexual abuse does not amount to ineffective assistance.

64

Second, Petitioner argues that despite his failure to disclose his sexual trauma, counsel should have investigated whether Petitioner was assaulted while housed in Arrendale State Prison because counsel knew that the correctional facility was extremely dangerous. (Doc. 87 at 144-145.) This argument fails because Petitioner denied that he was sexually assaulted in correctional facilities during his interview with Dr. Lisak. (Doc. 12, Attach. 6 at 61-62.) Trial counsel cannot be expected to investigate and offer evidence that Petitioner himself denies. See Van Poyck, 290 F.3d at 1324 (denying ineffective of assistance of counsel claim where evidence existed that petitioner experienced sexual abuse in prison, however, petitioner "denied that he was ever raped in prison . . . ."). Accordingly, trial counsel did not perform deficiently by failing to present evidence of the alleged sexual abuse that Petitioner suffered while housed in correctional facilities. See Anderson, 752 F.3d at 905 (finding counsel's performance was not deficient where counsel failed to discover that petitioner had been sexually abused because of "[petitioner's] multiple denials of having been sexually abused").

### b. Prejudice Prong

Regardless of whether trial counsel were deficient, the Court finds that Petitioner has not shown any prejudice arising from trial counsels' failure to present evidence of sexual abuse. Petitioner's sexual trauma constitutes additional evidence

supporting the theme that trial counsel presented to the jury—that Petitioner suffered a traumatic and abusive life. Although disturbing, such evidence would not have outweighed the substantial aggravating evidence that the jury heard at trial. Accordingly, Petitioner has not shown that prejudice resulted from the omission of evidence about his sexual trauma. Because Petitioner has failed to demonstrate that counsels' performance was deficient and has failed to show that he was prejudiced, Petitioner's claim that trial counsel were ineffective for failing to present evidence of his sexual trauma fails.

4. <u>Trial Counsels' Failure to Present A Mental Health Expert</u>

Next, Petitioner contends that his trial counsel were ineffective for failing to present a mental health expert at trial. (Doc. 87 at 136, 144-146.) Specifically, Petitioner contends that, although trial counsel hired Dr. James Maish to conduct psychological testing on Petitioner prior to trial, trial counsel performed deficiently because they failed to "provide Dr. Maish with the tools to conduct a productive mental health evaluation" and failed to "use Dr. Maish, or another qualified expert, to present mitigating health evidence . . . ." during the penalty phase of trial. (<u>Id.</u> at 147-148.) Petitioner avers that, without testimony from a mental health expert, the jury heard nothing about the "debilitating and lasting impact that severe childhood trauma,

66

such as [Petitioner] experienced, would have on [Petitioner's] life and mental health." (Id. at 148.)

To support his argument at the state habeas hearing, Petitioner presented the testimony of Dr. Lisak and the affidavit testimony of Dr. Maish. (Doc. 12, Attach. 6 at 2.) Based on Dr. Lisak and Dr. Maish's testimony, Petitioner avers:

> Had trial counsel undertaken a timely and minimally reasonable investigation of [Petitioner's] background, and provided such evidence to Dr. Maish or a similarly qualified expert, they could have presented compelling testimony at trial regarding the devastating effects of [Petitioner's] nightmarish childhood. Expert mental health testimony such as Dr. Lisak's, which explained the devastating and continuing effects of [Petitioner's] nightmarish life, would have cast [Petitioner's] crimes in a wholly different—and mitigating—light.

(Doc. 87 at 148-149.) After careful review of the evidence presented at trial and at the habeas hearing, the Court finds that Petitioner has not satisfied the requirements of Strickland.

### a. Deficiency Prong

First, Petitioner has failed to establish that trial counsels' performance was deficient. Petitioner asserts that trial counsel were deficient for failing to present Dr. Maish, or another mental health expert, at trial. (Doc. 87 at 148.) On review, the state habeas court found that trial counsels' decision to not present the testimony of a mental health expert at trial was not deficient because the results of the psychological tests that Dr.

67

Maish performed on Petitioner were not beneficial to the defense. (Doc. 22, Attach. 32 at 11-12.)

After careful review, the Court finds that the state habeas court's conclusion is not based on unreasonable findings of fact, based on an unreasonable application of federal law, or contrary to law. Although testimony from a mental health expert is typically crucial in death penalty cases, this Court agrees that trial counsels' decision not to present such testimony was not deficient. This is not a case in which trial counsel failed to utilize a mental health expert altogether. See, e.g., Porter, 558 U.S. at 39-40, 130 S. Ct. at 453 (finding counsel deficient where, even after court-ordered competency evaluations indicated that petitioner served in the military and spent little time in school, counsel failed to further investigate and uncover any evidence of petitioner's mental health or mental impairment); Jones, 834 F.3d at 1306-07, 1312 n.6 (holding that counsel's performance was deficient because he did not have the defendant evaluated by a mental health expert despite evidence that neuropsychological testing was needed and that the petitioner suffered from "long-standing psychotic disturbance" and hallucinations); Sealey v. Warden, 954 F.3d 1338, 1356 (11th Cir. 2020) (noting that trial counsel's decision not to further investigate the petitioner's mental health, despite having requested and received funding from

the trial court for a complete psychological evaluation, was "deeply troubling").

Rather, approximately two months before trial, trial counsel hired Dr. Maish to conduct "a battery of neuropsychological, intelligence and personality testing" on Petitioner. (Doc. 14, Attach. 3 at 21.) To conduct these tests, Dr. Maish met with Petitioner multiple times before trial. (Doc. 19, Attach. 23 at 1, 47, 51, 61, 68, 70.) Dr. Maish's evaluation of Petitioner "revealed no gross signs of neurological impairment and no issues regarding intellectual functioning." (Doc. 14, Attach. 3 at 21.) Because Dr. Maish concluded that Petitioner did not suffer from any neurological or intellectual impairment, trial counsel decided against presenting Dr. Maish at trial. (Doc. 17, Attach. 11 at 89-90.) Because Dr. Maish concluded that Petitioner did not suffer from any neurological or intellectual impairment, the state habeas court reasonably concluded that his testimony would not have been beneficial to Petitioner's case. (Doc. 22, Attach. 33 at 11); see DeYoung v. Schofield, 609 F.3d 1260, 1287-88 (11th Cir. 2010) (finding state habeas court's conclusion that trial counsel was not contrary to, or an unreasonable application of, Supreme Court precedent where trial counsel decided not to offer mental health evidence because the evidence discovered by the mental health expert was not helpful).

69

In reality, Dr. Maish's testimony at trial about Petitioner's test results would have opened the door for the State to present unfavorable and aggravating evidence. For example, the State could have highlighted that Petitioner made the conscious, premeditated decision to murder Mr. Deal and that, because Dr. Maish's testing of Petitioner "revealed no gross signs of neurological impairment and no issues regarding intellectual functioning," Petitioner appreciated the criminality of his conduct. See Jones, 834 F.3d at 1313 (affirming state court's finding that trial counsel was not deficient for failing to present a mental health expert because "had [the mental health expert] testified at the penalty phase regarding [the petitioner's] mental illness, that testimony would have opened the door to a significant body of unfavorable and damaging evidence"); Franks v. GDCP Warden, 975 F.3d 1165, 1177-78 (11th Cir. 2020) (affirming district court's denial of ineffective assistance claim where trial counsel did not hire or present a mental health expert at trial because the pretrial investigation and interviews with the defendant and defendant's family did not indicate that defendant had any mental health issues). Trial counsel also did not perform deficiently for failing to find a mental health expert that would have testified differently from Dr. Maish. See Elledge v. Dugger, 823 F.2d 1439, 1447 n.17 (11th Cir. 1987), opinion withdrawn in part on denial of reh'g, 833 F.2d 250 (11th Cir. 1987) ("We emphasize that the duty

70

is only to conduct a reasonable investigation. Counsel is not required to 'shop' for a psychiatrist who will testify in a particular way."). In sum, trial counsel were not deficient for failing to present Dr. Maish as a witness during trial.

### b. Prejudice Prong

Even assuming Petitioner could prove that trial counsel were deficient for failing to offer a mental health expert at trial, Petitioner has not shown that he suffered any prejudice from such a deficiency. The state habeas court rejected Petitioner's argument that without testimony from a mental health expert the jury did not hear about the impact that childhood trauma had on Petitioner. (Doc. 22, Attach. 32 at 12.) In the state habeas court's view, Petitioner was not deprived of a fair trial because "the issues discussed by Dr. Lisak were presented to the jury" by Mr. Yungman. (Id.) This Court agrees and finds that the state habeas court's conclusion is not based on unreasonable findings of fact, based on an unreasonable application of federal law, or contrary to law.

The Eleventh Circuit has held that "counsel's failure to present cumulative evidence is not ineffective assistance." Reaves v. Sec'y, Fla. Dep't of Corr., 872 F.3d 1137, 1157 (11th Cir. 2017); Turner v. Crosby, 339 F.3d 1247, 1277 (11th Cir. 2003) (concluding trial counsel's performance was not deficient for failing to submit cumulative testimony to the jury during the

penalty phase of trial); <u>Glock v. Moore</u>, 195 F.3d 625, 636 (11th Cir. 1999) (concluding that, "where much of the new evidence that [petitioner] presents is merely repetitive and cumulative to that which was presented at trial," the petitioner cannot show prejudice). Below, the Court will outline the substantial similarity between Dr. Lisak's testimony at the state habeas hearing and Dr. Yungman's testimony at trial:

- Dr. Liask testified that he "would describe what [Petitioner encountered, what he experienced as torture, not abuse." (Doc. 12, Attach. 6 at 9.) Similarly, Mr. Yungman testified that Petitioner was "targeted and tormented" by his father and stepmother. (Doc. 11, Attach. 10 at 66.)

- Dr. Lisak testified that Petitioner's stepmother would "push his head under water and hold him under water until . . . [Petitioner] felt like his lungs were bursting . . . ." (Doc. 12, Attach. 6 at 21.) Similarly, Mr. Yungman testified at trial that Petitioner's stepmother "would hold his head under water." (Doc. 11, Attach. 10 at 66.)

- Dr. Lisak testified that Petitioner was "made to sleep on the filthy laundry in the closet . . . ." (Doc. 12, Attach. 6 at 28.) Similarly, Mr. Yungman testified that Petitioner's stepmother "made him sleep in a closet on wet clothes . . . . what she would do is wrap up the wet bedding, throw it in the closet, and throw [Petitioner] in the closet on top of the . . . wet bed clothes." (Doc. 11, Attach. 10 at 66.)

- Dr. Lisak described how Petitioner's stepmother would "truss [Petitioner] up on this door" with "a tie that was wrapped around his neck" and "the only thing that prevented him from literally strangling was his feet balancing on this round doorknob . . . ." (Doc. 12, Attach. 6 at 22.) Similarly, Mr. Yungman testified that Petitioner's stepmother "somehow hung him up from a door with a rope around his neck with his feet on the door knob so that if he would move off of the door knob,

then he would choke himself." (Doc. 11, Attach. 10 at 67.)

- Dr. Lisak testified that Petitioner's biological mother was diagnosed with schizoaffective disorder. (Doc. 12, Attach. 6 at 16.) Similarly, Mr. Yungman testified that Petitioner's biological mother had schizoaffective disorder and that she was Petitioner's primary caregiver for several years. (Doc. 11, Attach. 10 at 50, 73.)

- Dr. Liask testified that bedwetting was a "chronic problem for [Petitioner]" and that "bedwetting is a classic sign or symptom of very serious disturbance in a child . . . ." (Doc. 12, Attach. 6 at 28.) Similarly, Mr. Yungman testified at trial that Petitioner's stepmother would "punish him for wetting his bed" and that "internalizing disorders are any nervous condition, any anxiety-provoking behavior, and in [Petitioner's] case, it-it took the form of bedwetting." (Doc. 11, Attach. 10 at 55-56.)

- Dr. Lisak testified that "the worse the abuse . . . then the more other kinds of negative factors you have, like family history of violence, family history of substance abuse, mental illness . . . the greater the likelihood of violent outcome." (Doc. 12, Attach. 6 at 42.) Dr. Lisak also stated that as an individual has "more and more of these negative factors" in his life, such as mental illness, substance abuse, different forms of trauma, "the risk of violence increases." (Doc. 12, Attach. 6 at 63.) On the same note, Mr. Yungman testified that "[t]he fact that [Petitioner] had 24 of 28 [risk factors from the Juvenile Justice Report] would have made it quite likely that he would engage in future criminal conduct . . . ." (Doc. 11, Attach. 10 at 88.)[16]

---

[16] On cross-examination, Dr. Lisak even conceded that his testimony during the state habeas hearing coincided with much of Mr. Yungman's testimony from trial. (See Doc. 12, Attach. 6 at 47, 48-49, 56-57.)

Dr. Lisak and Mr. Yungman also prepared for their testimony in similar fashions—both Dr. Lisak's evaluation and Mr. Yungman's evaluation of Petitioner consisted of interviewing Petitioner; interviewing Petitioner's family members; and reviewing Petitioner's school, medical, and mental health records. (Doc. 11, Attach. 10 at 44; Doc. 14, Attach. 3 at 16.) Dr. Lisak interviewed Petitioner for seven hours, and similarly, Mr. Yungman interviewed Petitioner for eight hours. (Doc. 11, Attach. 10 at 44; Doc. 12, Attach. 6 at 7.) Dr. Lisak testified that the purpose of his evaluation of Petitioner's background was to "understand and explain" Petitioner's behavior. (Doc. 12, Attach. 6 at 63.) Likewise, Mr. Yungman testified that "[n]obody gets up one day and commits a crime without something going on in their life previously. And in [Petitioner's] case, I did this to try to explain why he behaved the way he did . . . ." (Doc. 11, Attach. 11 at 1.) Notably, neither Dr. Lisak nor Mr. Yungman conducted psychological testing on Petitioner. According to Dr. Lisak, "for this kind of evaluation, psychological tests really don't add anything." (Doc. 12, Attach. 6 at 7.)

All in all, Dr. Lisak's testimony varied minimally from Dr. Yungman's testimony at trial—they both testified that Petitioner suffered traumatic abuse and that such abuse likely stunted Petitioner's development and increased his risk of criminality. Notably, Petitioner has not identified inherently mitigating

74

evidence that Dr. Lisak testified about which was not presented to the jury by Mr. Yungman. Because the record clearly establishes that Dr. Lisak's testimony was cumulative of Mr. Yungman's trial testimony, Petitioner instead argues that "[t]he state habeas court had no rational ground to equate Yungman's testimony with testimony by a qualified mental health professional . . . regarding the deleterious and long-term effects of [Petitioner's] traumatic childhood and adolescence." (Doc. 87 at 196-197.) In other words, Petitioner argues that Dr. Lisak's testimony is more mitigating than Mr. Yungman's testimony simply because Dr. Lisak is a mental health professional. Petitioner, however, has not provided any support for this argument.

The Court recognizes that Dr. Lisak, unlike Mr. Yungman, testified about Petitioner suffering from dissociative symptoms.[17] Even if the Court construed Dr. Lisak's testimony about

---

[17] The Court emphasizes that Dr. Lisak did not diagnose Petitioner with a dissociative disorder. This is not a case where a mental health professional testified for the first time at the habeas proceeding that a petitioner has been diagnosed with a mental health condition. See, e.g., Rompilla v. Beard, 545 U.S. 374, 392, 125 S. Ct. 2456, 2469, 162 L. Ed. 2d 360 (2005) (finding that petitioner was prejudiced because evidence was presented for the first time at post-conviction proceedings that petitioner suffered from "organic brain damage, an extreme mental disturbance significantly impairing several of his cognitive functions"). Instead, here, Dr. Lisak's testimony did not offer any new diagnosis of Petitioner. Dr. Lisak merely testified about dissociative symptoms that Petitioner occasionally suffered, but Dr. Lisak failed to offer an opinion about whether Petitioner's symptoms affected his decision-making at the time of he murdered Mr. Deal.

Petitioner's dissociative symptoms as "new" mental health evidence[18], Petitioner has still not established that he was prejudiced by trial counsels' decision not to present such evidence, especially considering that the mental-health evidence presented at the habeas hearing is not "as compelling as mitigating evidence in cases where the Supreme Court has held that habeas relief was warranted." Sealey, 954 F.3d at 1357.

For example, the Supreme Court found that a petitioner was prejudiced by his trial counsel's deficiencies in Porter v. McCollum because counsel failed to present evidence of "(1) [petitioner's] heroic military service in two of the most critical—and horrific—battles of the Korean War, (2) his struggles to regain normality upon his return from war, (3) his childhood history of physical abuse, and (4) his brain abnormality, difficulty reading and writing, and limited schooling." 558 U.S. 30, 41, 130 S. Ct. 447, 454, 175 L. Ed. 2d 398 (2009). In contrast to Porter, the mental health evidence at issue here—that Petitioner suffered dissociative symptoms in the past but was not diagnosed with any

---

[18] From the Court's perspective, Mr. Yungman discussed issues akin to disassociation at trial when he testified about Petitioner's anxiety and bedwetting as an "internalizing disorder." (Doc. 11, Attach. 10 at 55-56.) Mr. Yungman described internalizing disorders as "any nervous condition, any anxiety provoking behavior . . . ." (Id.) Similarly, Dr. Lisak discussed that "people who are subjected to childhood trauma are at much greater risk for . . . other kinds of anxiety disorders . . . ." (Doc. 12, Attach. 6 at 14.)

mental health disorder—is insufficient to establish prejudice. <u>See</u>
<u>Sealey</u>, 954 F.3d at 1357 (finding no prejudice where the mental
health evidence presented post-conviction only evidenced that
petitioner was mildly impaired).

Importantly, Dr. Lisak did not testify that Petitioner
suffered from dissociative symptoms at the time he murdered Mr.
Deal. From the Court's perspective, Petitioner's actions
surrounding the murder of Mr. Deal do not evidence behavior of an
individual suffering from dissociative symptoms. Petitioner
orchestrated the murder of Mr. Deal and Petitioner recited vivid
details about the murder, even stating that he has a "photographic
memory." (Doc. 11, Attach. 5 at 74-81.) Petitioner also concocted
the plan to make the murder scene appear as if Mr. Deal had
committed suicide. (<u>Id.</u> at 80.) Additionally, the record indicates
that Petitioner expressed remorse for his actions in his letters
to Ms. Parker, indicating that he understood the criminality of
his conduct. (Doc. 11, Attach. 10 at 141-146 (stating in a letter
to Ms. Parker that Petitioner expressed regret for "disregard[ing]
[his] principles").) Accordingly, any testimony about Petitioner's
dissociative symptoms would have been contradicted "by the State's
overwhelming evidence of [Petitioner's] . . . ability to engage in
logical thinking, goal directed and intentional conduct, and
concrete reasoning; his complete memory of his behavior at the
time of the murder; the fact that he had no mental problem that

77

detracted from his ability to appreciate the criminality of his conduct; and the lack of any causal relationship between his mental condition and the murder." Wood v. Allen, 542 F.3d 1281, 1312 (11th Cir. 2008) (finding no prejudice where counsel failed to present testimony from a psychologist in part because "the Rule 32 evidence, along with [the psychologist's] report, showed that [the petitioner] was highly functional, had full appreciation for the criminality of his conduct, and was indeed morally culpable").

Ultimately, Petitioner has also failed to demonstrate that Dr. Lisak's testimony would have caused the jury to conclude "that the balance of aggravating and mitigating circumstances did not warrant death." Johnson, 643 F.3d at 935. Considering the substantial aggravating evidence that the State presented during the sentencing phase, this is a case in which the new evidence presented at state habeas hearing "would barely have altered the sentencing profile presented" to the jury. Strickland, 466 U.S. at 700, 104 S. Ct. at 2052. Consequently, the state habeas court's conclusion that Petitioner was not prejudiced by trial counsels' failure to present a mental health expert was not unreasonable.

Lastly, Petitioner argues that trial counsel were ineffective for failing to provide Dr. Maish with information about Petitioner's background before his evaluation of Petitioner. (Doc. 87 at 148-149.) In Petitioner's opinion, information about Petitioner's background would have allowed Dr. Maish, or another

mental health expert, to present mitigating testimony like that presented by Dr. Lisak at the state habeas hearing. (Doc. 87 at 148-149, 151.) On review, the state habeas court, although it found that Petitioner was not prejudiced by counsel not presenting Dr. Lisak's testimony, did not squarely address the merits of Petitioner's claim that he was prejudiced by trial counsels' failure to provide Dr. Maish with information about Petitioner's background. Thus, this Court must review Petitioner's claim on this issue de novo. See Cone, 556 U.S. at 472, 129 S. Ct. at 1784.

To support his claim that trial counsel were ineffective for failing to provide Dr. Maish with information about Petitioner's background, Petitioner points to Dr. Maish's affidavit submitted to the state habeas court. In his affidavit, Dr. Maish stated that he "was provided with no background information about [Petitioner] by his attorneys," but Dr. Maish was "aware of the charges against [Petitioner] and the other crimes of which he had been accused." (Doc. 14, Attach. 3 at 21.) Dr. Maish stated that, during Petitioner's habeas proceedings, Petitioner's habeas counsel

> provided [him] a packet of materials pertaining to
> [Petitioner's] background, including the Georgia Supreme
> Court direct appeal decision in [Petitioner's] case;
> affidavits of friends and family members, the testimony
> of social worker Jeff Yungman; mental health records
> pertaining to [Petitioner] and family members; and the
> forensic report of [Dr. Lisak].

(Id. at 21-22.) Dr. Maish opined that "[h]aving reviewed and considered these materials," he concurred "with Dr. Lisak's

79

conclusions that [Petitioner] suffered extremely severe, chronic childhood abuse whose traumatic effects on [Petitioner's] psychological and moral development cannot be overstated." (Id. at 22.) Dr. Maish also agreed with Dr. Lisak's conclusion that Petitioner's history of abuse "was highly detrimental to the development of normal coping skills, including basic reasoning and judgment abilities, impulse control, as well as moral development." (Id. at 23.) Dr. Maish further stated that he could have offered testimony like Dr. Lisak's testimony at the sentencing phase had he reviewed materials on Petitioner's background. (Id.)

However, as explained above, Dr. Lisak's testimony did not add any "new" mitigating mental health evidence to the record and, in the Court's opinion, neither did Dr. Maish's affidavit testimony. Even assuming trial counsel were deficient for failing to provide Dr. Maish information about Petitioner's background, Dr. Maish's did not change his diagnosis of Petitioner after reviewing such information. Dr. Maish, in his affidavit testimony, generally stated that Petitioner's abusive and traumatic childhood "extremely elevated" Petitioner's risk for developing dissociative symptoms; yet, Dr. Maish did not diagnosis Petitioner with such a disorder post-conviction. (Doc. 14, Attach. 3 at 23.) Additionally, although Dr. Maish opined that Petitioner's "history of long-term abuse was highly detrimental to" Petitioner's development and made him more likely to engage in criminal conduct,

80

Dr. Maish did not explain whether Petitioner's stunted development made him unable to appreciate the criminality of his conduct. Without more, this Court cannot find that Petitioner was prejudiced by trial counsels' failure to provide Dr. Maish with Petitioner's background information prior to his pre-trial evaluation of Petitioner.

Petitioner attempts to compare this case to Rompilla v. Beard, 545 U.S. 374, 125 S. Ct. 2456, 162 L. Ed. 2d 30. (Doc. 87 at 151.) In Rompilla, the Supreme Court found that a petitioner was prejudiced by trial counsel's failure to obtain and review a file concerning the petitioner's prior conviction for rape and assault. 545 U.S. at 390, 125 S. Ct. at 2467-68. The petitioner's trial counsel knew that the state intended to establish the petitioner's criminal history by proving his prior conviction and by emphasizing the petitioner's violent character. Id. at 383, 125 S. Ct. at 2464. Despite knowing about the file and having easy access to it, trial counsel failed to review the file which contained, in part, the petitioner's mental health test results that indicated he suffered from schizophrenia and other disorders and that contained information on Petitioner's background and violent behavior. Id. at 385, 390-91, 125 S. Ct. at 2464, 2468. Because the trial counsel did not review the file, the mental health experts that examined the petitioner prior to trial were not given any information from the file, and thus their pretrial reports revealed "nothing useful"

81

to the petitioner's case. Id., 545 U.S. at 382, 125 S. Ct. at 2463. During the post-conviction proceedings, however, mental health experts concluded that the petitioner suffered from "organic brain damage, an extreme mental disturbance significantly impairing several of his cognitive functions." Id. at 392, 125 S. Ct. at 2469 (quotations omitted).

After comparing the evidence presented at trial to the evidence presented in the post-conviction proceedings, the Supreme Court concluded that the information contained in the file "would have destroyed the benign conception of [the petitioner's] upbringing and mental capacity that defense counsel had formed in talking with [the petitioner] and . . . from the reports of the mental health experts." Id., 545 U.S. at 391, 125 S. Ct. at 2468. The Supreme Court further held that this new mental health information "might well have influenced the jury's appraisal of [the petitioner's] culpability." Id., 545 U.S. at 393, 125 S. Ct. at 2469 (quotations omitted).

Based on Rompilla, Petitioner argues that his trial counsel failed to fulfill their duty to provide Petitioner's background information to Dr. Maish and that this failure prejudiced Petitioner. (Doc. 87 at 151.) Petitioner contends that, just as in Rompilla, the information about Petitioner's background would have allowed Dr. Maish to offer mitigating testimony that would have influenced the jury. This Court disagrees.

82

Rompilla is materially distinguishable from the facts of this case. First, the mental health evidence that the counsel in Rompilla failed to discover and present to the jury is fundamentally different than the evidence Petitioner contends should have been presented at trial in this case. In Rompilla, the petitioner's trial counsel did not investigate evidence that led mental health experts to conclude that the petitioner suffered from "organic brain damage, an extreme mental disturbance significantly impairing several of his cognitive functions." 545 U.S. at 392, 125 S. Ct. at 2469 (quotations omitted). In contrast, here, Petitioner's "new" mental health evidence includes only a testimony that Petitioner suffered from dissociative symptoms and that Petitioner had "lasting psychological effects" from the trauma. Unlike the inherently mitigatory nature of the petitioner's mental health evidence in Rompilla, Petitioner has not offered substantially mitigating evidence, especially considering that neither Dr. Maish nor Dr. Lisak diagnosed Petitioner with any cognitive disorder. In light of the fact that neither Dr. Lisak nor Dr. Maish, even after reviewing Petitioner's background information, did not diagnosis Petitioner with any psychological or intellectual disorder, this Court finds that trial counsels' decision not to provide Dr. Maish with more background information about Petitioner did not prejudice Petitioner. In other words, Petitioner has not established that

83

providing Dr. Maish with additional information would have changed the outcome of his diagnosis or the testimony he could have offered to the jury.

In conclusion, the Court finds that Petitioner has failed to establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." See Strickland, 466 U.S. at 694, 104 S. Ct. at 2068; see also Sealey, 954 F.3d at 1357 ("[T]he new mental-health evidence presented here—of mild mental impairment—is insufficient to establish prejudice."). And, as explained above, "[g]iven the overwhelming aggravating factors, there is no reasonable probability that the omitted evidence would have changed the conclusion that the aggravating circumstances outweighed the mitigating circumstances and, hence, the sentence imposed." Strickland, 466 U.S. at 700, 104 S. Ct. 2052; see also Jones, 834 F.3d at 1315 ("In the face of these powerful aggravators and the arguably limited mitigating value of [the doctor's] testimony, [the petitioner] has not come close to showing that the [state court] acted unreasonably in finding no prejudice on account of counsel's deficient performance."). As a result, Petitioner's ineffective assistance of trial counsel claim on this issue fails.

C. Ineffective Assistance of Appellate Counsel

Finally, Petitioner argues that he received constitutionally inadequate representation on appeal. (Doc. 87 at 210.) In

particular, Petitioner argues that his appellate counsel, Michael Edwards and Steven Beauvais, raised meritless claims and failed to raise credible claims on appeal. (<u>Id.</u> at 211-212.) Petitioner avers that appellate counsel should have challenged two issues on appeal: (1) the trial court's admission of Petitioner's inculpatory statement; and (2) prosecutorial misconduct. (<u>Id.</u> at 213, 218.)

Despite Petitioner's arguments to the contrary, the Court, in its order on procedural default, cause and prejudice, directed Petitioner to only brief arguments related to a limited claim concerning his appellate counsels' ineffectiveness. (Doc. 81 at 47.) Specifically, the Court stated that Petitioner may brief his claim that his counsel was ineffective for failing to raise on appeal trial counsels' failure to investigate and present mitigation evidence related to Petitioner's background and mental health. (<u>Id.</u>) In his brief, however, Petitioner does not argue that his appellate counsel failed to raise this limited error on appeal, but instead focuses on appellate counsels' failure to challenge the admission of Petitioner's incriminating statement and the State's direct examination of Pierre Byrd. Because these issues fall outside of the scope of the limited claims that the Court permitted Petitioner to brief, the Court will not consider the claims in this order.

Even assuming that Petitioner had properly briefed his ineffective assistance of appellate counsel claim, the Court would

85

deny his claim on the merits as well. "Claims of ineffective assistance of appellate counsel are governed by the same standards applied to trial counsel under Strickland." Philmore v. McNeil, 575 F.3d 1251, 1264 (11th Cir. 2009), cert. denied, --- U.S. ----, 130 S. Ct. 1884, 176 L. Ed. 2d 370 (2010)). To ascertain whether appellate counsel rendered ineffective assistance in omitting Petitioner's ineffective trial counsel claims in a motion for new trial or on direct appeal, the Court would review the merits of the omitted claims. DeYoung, 609 F.3d at 1283 n.22 (citing Philmore, 575 F.3d at 1260); Ferrell v. Hall, 640 F.3d 1199, 1225 (11th Cir. 2011) ("In other words, whether appellate counsel failed to properly challenge trial counsel's mitigation inquiry focuses on essentially the same corpus of evidence and the same legal questions underlying trial counsel's effectiveness—which strategies did trial counsel pursue, were those strategies reasonable under the circumstances, and what kinds of penalty-phase evidence was developed, or could reasonably have been developed."). Because the Court has determined that Petitioner's ineffective trial counsel claims cannot survive, the Court would likewise deny Petitioner's claim that his appellate counsel were ineffective for failing to raise such claims on appeal. See DeYoung, 609 F.3d at 1283 n.22; Owen v. Sec'y for Dep't of Corr., 568 F.3d 894, 915 (11th Cir. 2009) (holding that if issues are without merit, "any deficiencies of [appellate] counsel in failing

to raise or adequately pursue them cannot constitute ineffective assistance of counsel").

## IV.  CERTIFICATE OF APPEALABILITY

Federal Rule of Appellate Procedure 22(b)(1) states in part: "In a habeas corpus proceeding in which the detention complained of arises from process issued by a state court . . . the applicant cannot take an appeal unless a circuit justice or a circuit or district judge issues a Certificate of Appealability under 28 U.S.C. § 2253(c)." Pursuant to 28 U.S.C. § 2253(c)(2), a district judge should issue a COA "only if the applicant has made a substantial showing of the denial of a constitutional right." The United States Supreme Court has stated that "[t]he COA inquiry . . . is not coextensive with a merits analysis." Buck v. Davis, -- U.S. --, 137 S. Ct. 759, 773, 197 L. Ed. 2d 1 (2017). Rather, "[a]t the COA stage, the only question is whether the applicant has shown that 'jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.' " Id. (quoting Miller-El v. Cockrell, 537 U.S. 322, 336, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003)).

In this case, Petitioner has failed to make a substantial showing of the denial of a constitutional right with respect to his ineffective assistance of counsel claims. The Court finds that

no jurists could disagree with the Court's conclusions on the issues presented in Petitioner's ineffective assistance claims. Accordingly, Petitioner is **DENIED** a COA as to his ineffective assistance of trial counsel claim and his ineffective assistance of appellate counsel claim.

### CONCLUSION

For the foregoing reasons, Petitioner has failed to establish that he is entitled to relief under 28 U.S.C. § 2254. Accordingly, his petition for a writ of habeas corpus is **DENIED.** The Clerk of Court is **DIRECTED** to close this case.

SO ORDERED this 30th day of August 2021.

_____
WILLIAM T. MOORE, JR.
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA